WARREN CHEVROLET, INC., Plaintiff-Appellee, v. BRIAN BEMIS, Defendant-Appellant.

Third District   No. 3—89—0320

Opinion filed May 18, 1990.

Barbara Slingerland, of Gallagher, Klein & Brady, of De Kalb (T. Jordan Gallagher, of counsel), for appellant.

Califf, Harper, Fox, Dailey, Slover & Moorhouse, P.C., of Moline (Roger L. Strandlund, of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

This appeal concerns a contract dispute. Brian Bemis (Bemis) and Warren Chevrolet, Inc. (the company), entered into certain agreements whereby Bemis was to become employed with the company and would have the right to purchase 25% of the business. It was further agreed that in the event Bemis' employment was terminated, the company would be allowed to repurchase all of his shares at "book value." The company hired Bemis as the general sales manager. Approximately two years later, Bemis left the company in order to purchase his own dealership. Thereafter, the company gave Bemis notice of its election to redeem the shares pursuant to the agreement. Bemis did not surrender his shares, and the company sued to specifically perform the agreement. Bemis, contesting the value assigned the shares, filed a counterclaim alleging fraud and, alternatively, breach of contract. In addition, the parties disputed whether a sum of money had been paid to Bemis as a bonus.

The trial court found in favor of the company on the issues involving the value and resale of the shares, and against Bemis on his counterclaims. Bemis appeals this ruling. The trial court further found that the sum of money at issue had been paid to Bemis as a bonus. The company has taken a cross-appeal from this finding.

The record shows that at the commencement of the negotiations between Bemis and the company, Bemis, a high school graduate, had worked in the automobile sales business for eight years. The company, an Iowa corporation qualified to transact business in Illinois, decided to hire a general manager in order to boost sales.

Bemis understood that he was to receive a 25% interest in the company's net worth. The company understood that Bemis was to have 25% ownership. Dan Churchill, the company's attorney, testified that Byron Warren (Warren) talked to Bemis about selling 25% of the

corporate stock. The parties never agreed on what exactly comprised 25% of the business. The stock was to be sold at a fair price. Bemis claims that he was to buy 25% of the business for $60,000. The parties directed Churchill to draft the agreement. In the meantime, Bemis began working for the company. Five months later, the parties signed the agreement. This contract, Bemis alleges, does not reflect the sale of 25% of the business as had been previously agreed.

Under the contract, Bemis received 300 shares of newly issued stock. Warren told Bemis that the company was issuing new stock in order to avoid paying a capital gains tax, which would be required if Bemis purchased stock which had already been issued. The company had previously issued 2,255 shares of preferred stock and 900 shares of common stock. Thus, Bemis actually received 300 out of 3,455 shares or approximately 8½% of the company's total stock.

Bemis claims that he was not aware that the company issued two types of stock: common stock and preferred stock. He became aware of this when, at a meeting, Churchill informed Warren that, should Bemis be sold 25% of the shares issued, Bemis would have a greater percentage of voting rights than Warren. Bemis allegedly was told the preferred stock was valueless, had only voting rights, and had been issued in order for the family to maintain voting control of the corporation.

Further, during the negotiations, Bemis relied exclusively on the balance sheet section of the General Motors Operating Reports (GM reports) for financial information regarding the company's net worth. Bemis and the company agree that the GM reports are normally used to determine the financial condition of a dealership. The company also keeps a general ledger reflecting a net worth which differs from that reflected in the GM reports. Bemis alleges that the company fraudulently concealed the general ledger from him.

This dispute centers on Account 380 of the GM reports. It is not disputed that the company posted shareholder loans in Account 380. These loans were made by Warren and his father to the company in order to increase the company's working capital. Doug Schott, a partner with the accounting firm that conducted the audit in this case, testified that Account 380 enables the company to improve its ability to satisfy the GM capital standard. Bemis contends that the shareholder loans were concealed in the GM reports. However, Bemis' own accountant, William Kelly, testified that Account 380 stood out in the GM reports and that he would have inquired into the contents of Account 380.

Furthermore, Churchill states that at a meeting he had with

Bemis, he represented to Bemis the existence and value of the preferred stock, identified the shareholder loans in an amount equal to the number posted in Account 380, deducted that figure from the company's net equity, and calculated his estimate of the book value of the common stock as being $26.63 per share. Bemis did not have an accountant present at the meeting with Churchill.

The company emphasizes that Bemis did not investigate the company's financial records before signing the agreement. The record indicates that within one year prior to the agreement at issue here, Bemis attempted to purchase a different dealership. During those negotiations, Bemis hired Kelly to investigate the dealership's financial condition. After Kelly reviewed the income tax returns and other documents, Bemis decided not to purchase the dealership. Here, however, Bemis did not hire Kelly to investigate the company's financial condition. Instead, Bemis, who testified that he has taken one course in basic accounting at a community college, relied exclusively on the GM reports before signing the contract. Bemis did not request other financial documents from the company.

After Bemis terminated his employment with the company, the company hired an accounting firm to conduct an audit for purposes of determining the book value of Bemis' stock. Schott was in charge of the audit. The audit revealed a stockholder's equity of $349,298. This amount, Bemis alleges, was more than $460,000 less than that shown on the GM reports. The accounting firm based the audit on all of the company's financial records, including the general ledger. The disparity in the figures, Bemis claims, results from the company improperly listing certain shareholder loans made to the company as assets in Account 380 rather than liabilities, whereas these loans were designated liabilities in the general ledger. Bemis contends that characterizing the loans as assets contravened generally accepted accounting practices.

The company, to the contrary, asserts that Schott's analysis of book value did not violate any generally accepted accounting principles. Schott and Kelly testified that the audit was conducted in accordance with generally accepted accounting principles. Schott testified that, as of the date of Bemis' termination, the per-share book value was $96.15, providing a book value of $28,845 for Bemis' 300 shares. Bemis did not present evidence refuting this calculation of book value. Kelly testified, moreover, that he would not rely exclusively on the GM reports as the sole measure of book value.

In addition, the accountants further agreed that in advising potential purchasers of corporate stock, they follow certain investigative procedures. At a minimum, the corporate minutes and tax returns

would be included in their investigation of a company's financial condition. Kelly noted that had he been provided the opportunity to review the company's income tax returns, he would have been able to identify the existence and value of the preferred stock and shareholder loans. Kelly also noted that he ordinarily would consult the general ledger and would not rely exclusively on the GM reports.

■ Bemis initially contends that the trial court's finding in favor of the company was against the manifest weight of the evidence. Bemis claims that the evidence establishes that he was fraudulently induced into signing the agreement. The gravamen of Bemis' argument is that the company committed fraud by allegedly concealing the fact that preferred stock existed and by failing to provide him with the general ledger. The Illinois Supreme Court explained misrepresentation and fraud as follows:

> "[F]or a misrepresentation to constitute fraud which invalidates a contract, it must be a representation in the form of a statement of a material fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement." (*Wilkinson v. Appleton* (1963), 28 Ill. 2d 184, 187, 190 N.E.2d 727, 729-30.)

An affirmative statement is not always required, however, and fraud may also consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak. (*Tan v. Boyke* (1987), 156 Ill. App. 3d 49, 508 N.E.2d 390.) The relevant question is whether or not, considering the facts known to him and the facts which he would have known had he exercised ordinary prudence, Bemis had a right to rely on the company's alleged misrepresentations.

■ In the instant case, we find that Bemis presented no evidence of fraudulent intent on the company's part. Bemis claims that Churchill told him that the preferred stock had no value, but had voting rights. Churchill, in contrast, testified that he identified the value of the preferred stock at the meeting with Bemis. We emphasize that the company records of preferred and common stock outstanding were readily available to Bemis. The corporate records, which show the existence, amount, and value of the company's preferred stock, were also on file with the Iowa Secretary of State's office.

In *Tan v. Boyke* (1987), 156 Ill. App. 3d 49, 508 N.E.2d 390, the

plaintiff claimed that the defendant misrepresented that the apartment building he was to purchase contained a total of 66 units, when in fact five of the units were unlawful, and defendant failed to disclose that the buildings were in violation of zoning ordinances. Addressing the defendant's claim that the plaintiff failed to exercise ordinary prudence in recognizing the discrepancy, the court noted that "only a complicated analysis of the plat of survey and the applicable zoning ordinances would have revealed *** the irregularities *** and *** illegalit[ies]." *Tan v. Boyke* (1987), 156 Ill. App. 3d 49, 58, 508 N.E.2d 390, 396.

In the instant case, determining the amount and value of the company's preferred shares required no such complicated analysis. We find it significant that Bemis did not request the records from the company. Churchill's testimony, when combined with Bemis' failure to exercise even a modicum of due diligence in investigating the company's financial records, indicates that the company did not fraudulently conceal the amount and value of the preferred shares from Bemis. Accordingly, with respect to the preferred shares, we find the company's actions did not constitute fraud.

■■■ Bemis further contends that the company's practice of designating shareholder loans in Account 380 as assets rather than liabilities constitutes fraud as a matter of law. We disagree. Generally, fraud means anything intended to deceive, including all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage to another. (*Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 433 N.E.2d 315.) Although a plaintiff's negligence is not generally a defense to an action for fraud, there are situations in which the plaintiff is required to inquire about representations. *National Republic Bank v. National Homes Construction Corp.* (1978), 63 Ill. App. 3d 920, 381 N.E.2d 15.

In deciding whether he reasonably placed his trust in the alleged misrepresentations, all of the facts which Bemis had actual notice of and all of those which he might have learned if he had exercised ordinary prudence may be taken into account. (*Metropolitan Bank & Trust Co. v. Oliver* (1972), 4 Ill. App. 3d 975, 283 N.E.2d 62.) As the court in *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 141, 213 N.E.2d 89, 92-93, noted:

> "If, by the exercise of ordinary prudence, he had ample opportunity to determine the truth of the representations before acting, but failed to do so, he is charged with knowledge and may not then be heard to say that his loss was due to the deceit of another."

The company decided years ago to list the shareholder loans as assets rather than liabilities in Account 380. This decision was not made in order to conceal information from Bemis. Rather, the company decided to designate the shareholder loans as assets rather than liabilities in order to boost its capital base. We find Kelly's testimony, that had he been hired by Bemis prior to the transaction he would have identified the loans in Account 380, significant. At trial, Bemis testified that, although he hired Kelly to review the financial records of the other dealership he attempted to purchase, in this case he did not hire Kelly because "he felt the potential was good at the dealership." We note that Bemis is not a rookie in the car dealership business. He is the owner of the "Brian Bemis Chrysler-Plymouth-Dodge," "Brian Bemis Mercury-Lincoln-Volkswagon," and is the secretary of the "Yakim-Bemis Ford Nissan, Inc." Indeed, during the negotiations surrounding the Ford Nissan dealership acquisition, Bemis hired an accountant and an attorney. In addition, Bemis knew that the general ledger existed when he signed the agreement; however, he did not request to see it. Bemis admitted, moreover, that when he quit his other job prior to working for the company, the purchase price of the stock had not been set and that before he decided to purchase the stock he asked no questions about the assets of the corporation or what comprised 25% of the business.

It is well settled that fraud must be proved by clear and convincing evidence (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499), and the trial court's decision as to this matter will not be set aside unless it is against the manifest weight of the evidence. (*Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427.) Here, Bemis essentially asserts that the failure to volunteer even the most rudimentary information when negotiating significant business transactions, although said information was not even requested, constitutes actionable fraud. If Bemis' arguments were to prevail, we believe this case would place an unreasonable burden on parties, like the company in the instant case. Moreover, although this court will not question Bemis' business acumen, we do take heart at his indicating in his deposition that if he had to do it over again he'd hire an accountant and an attorney.

We conclude, therefore, that a self-proclaimed possessor of good young ideas cannot use a claim of fraudulent inducement as a shield after entering into a less than advantageous business deal. Accordingly, because we find Bemis did not meet his burden of proof, the trial court's decision in favor of the company and against Bemis was not against the manifest weight of the evidence.

■ Bemis makes an ancillary argument that the trial court's find-

ing with respect to the book value of the shares was against the manifest weight of the evidence. After reviewing the record, however, we find no merit in this argument for Bemis does not challenge the audit performed herein. Rather, Bemis suggests that the book value of the stock was significantly reduced due to the alleged fraudulent inducement. Therefore, because we affirm the trial court's holding on the fraud issue, Bemis' ancillary argument also fails.

Finally, with respect to the cross-appeal, we find the record to indicate that the company paid $15,184 to Bemis as a bonus. The trial court found the payment to be a bonus. Indeed, Warren testified that he intended to pay this amount to Bemis as a bonus. Accordingly, we affirm the trial court's finding this payment to be a bonus and the trial court's denial of the company's motion for sanctions against Bemis.

For these reasons, we affirm the judgment of the circuit court of Rock Island County.

Affirmed.

HEIPLE, P.J., and BARRY, J., concur.