HAVOCO OF AMERICA, LTD., a Delaware Corporation, Plaintiff–Appellant, Cross–Appellee,

v.

SUMITOMO CORPORATION OF AMERICA, Defendant–Appellee,

and

Elmer C. Hill, Defendant–Appellant, Cross–Appellee.

Nos. 91–1195, 91–1196 and 91–1279.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 16, 1991.

Decided Aug. 7, 1992.

Rehearing Denied Sept. 9, 1992.

Paul B. Episcope, John Erb; Richard P. Campbell, Anthony S. DiVincenzo (argued), Campbell & DiVincenzo; and Susan B. Padove, Coleman & Associates, Chicago, Ill., for plaintiff.

Kathleen M. O'Laughlin, Richard L. Horn, Barbara J. Mulvanny, Keck, Mahin & Cate; Howard Joseph; Sheldon Karon (argued); and Michael A. Stick (argued), Ronald Butler, Kevin J. O'Brien, and Ellen M. Babbitt, Butler, Rubin, Newcomer, Sal-

tarelli, Boyd & Krasnow, Chicago, Ill., for defendants.

Before COFFEY, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

The dispute in this diversity suit (governed, the parties agree, by Illinois law) centers around a long-term coal supply contract which plaintiff Havoco of América, Ltd. ("Havoco") entered into with the Tennessee Valley Authority ("TVA") in 1975. Havoco agreed to supply the TVA with 2.4 million tons of coal per year for 10 years at $23.85 per ton—a total contract price of $572,000,000. To fulfill its obligations under that contract, Havoco also entered into several related contracts. The R & F Coal Company ("R & F Coal") agreed to sell Havoco the coal for $18.50 per ton, and defendant Sumitomo Shoji America, Inc. ("Sumitomo") agreed to supply the financing for the deal. Defendant Elmer C. Hill ("Hill"), who owned Hilco, Inc. ("Hilco"), a coal brokerage business, first negotiated with Havoco on behalf of Sumitomo. After the contracts were signed, Hill became an officer and director of Havoco and administered the contracts.

Havoco's coal supply contract with the TVA provided that either party had the right to demand renegotiation of the contract price of the coal six months after execution of the contract. The TVA exercised this right in August 1975. Hill represented Havoco during the renegotiations but was unable to reach an agreement with the TVA. On March 3, 1976, coal shipments to the TVA were suspended. On March 19, 1976, as a result of this stalemate and other events, Havoco assigned the TVA contract to R & F Coal. After the assignment, Hill represented R & F Coal in continued negotiations with the TVA; R & F Coal eventually reached an agreement with the TVA, and Hill received a commission on the agreement from R & F Coal.

In January 1981, Havoco filed suit against Hill and Hilco alleging that,

through fraud, conspiracy to defraud, tortious interference with contractual relations and breach of fiduciary duty, Hill coerced Havoco into assigning the TVA contract to R & F Coal. In November 1981, Havoco amended its complaint to add Sumitomo as a defendant on the fraud claims; the amended complaint also contained an additional count against Sumitomo for breach of the financing agreement. This case is making its third appearance in this court. The first two times we reversed grants of summary judgment in favor of the defendants. *Havoco of America v. Hilco, Inc.*, 799 F.2d 349 (7th Cir.1986); *Havoco of America v. Hilco, Inc.*, 731 F.2d 1282 (7th Cir.1984). After the last remand, Sumitomo filed another motion for summary judgment. The district court found that all the counts against Sumitomo, except breach of contract, were barred by the statute of limitations and entered judgment in favor of Sumitomo on those counts. 750 F.S. 946 (N.D.Ill.1990). Havoco appeals the district court's grant of summary judgment on its breach of fiduciary duty count against Sumitomo. Also, after a four-week trial, a jury found that Havoco had waived its breach of contract claim against Sumitomo but found for Havoco on all of its claims against Hill, awarding compensatory damages of $14,250,000 and punitive damages of $750,000. Both Havoco and Hill appeal the jury's verdict.[1]

## I. Havoco's Appeal

In No. 91–1195, Havoco appeals the judgment entered in favor of Sumitomo, raising two issues. First, Havoco challenges the district court's grant of summary judgment in favor of Sumitomo on the breach of fiduciary duty claim. Havoco maintains that the breach of fiduciary duty claim was not barred by the applicable Illinois statute of limitations. Second, Havoco argues that it did not waive its breach of contract claim against Sumitomo. We reject both arguments and affirm the judgment in favor of Sumitomo.

---

1. At the close of Havoco's case, the district court granted Defendant Hilco's motion for a directed verdict. Havoco does not appeal that ruling.

## A. Breach of Fiduciary Duty

In March 1975, Havoco and Sumitomo entered into a sales agency agreement. This contract required Sumitomo to provide Havoco financing for the TVA contract in the form of a $ 5.5 million, irrevocable, thirty-day revolving letter of credit. As consideration, Havoco designated Sumitomo as its agent for the sale of coal to the TVA and authorized the TVA to make payments for coal directly to Sumitomo. Havoco also agreed to pay Sumitomo $ 0.85 for each ton of coal sold to the TVA. It is undisputed that this contract created an agency relationship between Havoco and Sumitomo. Under Illinois law, Sumitomo, as Havoco's agent, owed Havoco a fiduciary duty as a matter of law. *Ray v. Winter*, 67 Ill.2d 296, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977).

In November 1981, Havoco amended its complaint to add Sumitomo as a defendant. The amended complaint alleges that Sumitomo breached its fiduciary duty to Havoco by conspiring with Hill and R & F Coal to fraudulently induce Havoco to assign the TVA contract to R & F Coal. In *Havoco of America, Inc. v. Hilco, Inc.*, 799 F.2d 349, 352 (7th Cir.1986) (*"Havoco II"*), we held that Havoco had at least partial knowledge of the alleged fraud when it assigned the TVA contract to R & F Coal on March 19, 1976. Accordingly, on remand from *Havoco II*, the district court granted summary judgment against Havoco on the breach of fiduciary duty count holding that it was barred by the five-year statute of limitations in section 13–205 of the Illinois Code of Civil Procedure, Ill.Rev.

Stat. ch. 110, ¶ 13–205.[2] Since Havoco had at least some knowledge of the alleged fraud in March 1976, the district court found, its breach of fiduciary duty claim—filed in November 1981, over five years later—was time-barred. Havoco appeals this decision; we review the district court's grant of summary judgment *de novo*. *LaScola v. US Sprint Communications*, 946 F.2d 559, 563 (7th Cir.1991).

Havoco, citing *Kinzer v. City of Chicago*, 128 Ill.2d 437, 132 Ill.Dec. 410, 539 N.E.2d 1216 (1989), argues that breach of fiduciary duty claims arise from the principles of contract, not tort, and are therefore governed by the ten-year statute of limitations in section 13–206 of the Illinois Code of Civil Procedure. Ill.Rev.Stat. ch. 110, ¶ 13–206.[3] As an initial matter, we agree with Sumitomo that Havoco has waived this argument by failing to present the issue in a timely fashion in the district court. Havoco did not attempt to assert the Illinois ten-year statute of limitations during the briefing on Sumitomo's motion for summary judgment or when that motion was pending. Rather, Havoco first made this argument after the four-week jury trial in a Rule 59(e) motion to alter or amend the judgment. But such motions cannot be used to raise new arguments which could and should have been raised before judgment was entered. *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 425 (7th Cir.1989). Havoco contends that it could not have raised this argument sooner because the *Kinzer* case was decided after it filed its response to Sumitomo's motion

---

**2.** Section 13–205 reads as follows:

Except as provided in Section 2–725 of the "Uniform Commercial Code", approved July 31, 1961, as amended, and Section 11–13 of "The Illinois Public Code", approved April 11, 1967, as amended, actions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued. Ill.Rev.Stat. ch. 110, ¶ 13–205.

**3.** Section 13–206 reads as follows:

Except as provided in Section 2–725 of the "Uniform Commercial Code", actions on bonds, promissory notes, bills of exchange, written leases, written contracts, or other evidences of indebtedness in writing, shall be commenced within 10 years next after the cause of action accrued; but if any payment or promise to pay has been made, in writing, on any bond, note, bill, lease, contract, or other written evidence of indebtedness, within or after the period of 10 years, then an action may be commenced thereon at any time within 10 years after the time of such payment or promise to pay. Ill.Rev.Stat. ch. 110, § 13–206.

for summary judgment. But, *Kinzer* was decided in April 1989, and the district court did not grant summary judgment until October 1990—18 months later. Havoco does not explain why it failed to advise the district court of the *Kinzer* decision during these 18 months.

■ In any case, Havoco is wrong on the merits. *Kinzer* was about the applicability of the Illinois Tort Immunity Act, Ill.Rev. Stat. ch. 85, §§ 1–101 *et seq.*, to actions for breach of fiduciary duty. *Kinzer*, 132 Ill. Dec. at 414, 539 N.E.2d at 1220. The Illinois Supreme Court held that the Tort Immunity Act did not bar the plaintiff's suit because actions for breach of fiduciary duty are "controlled by the substantive laws of agency, contract and equity." *Id.* (citations omitted). The court rejected the *Restatement (Second) of Torts'* view that breach of fiduciary duty is a tort. *Id.* The court in *Kinzer*, however, had nothing to say about the proper statute of limitations for breach of fiduciary duty claims, and its holding is not dispositive of this issue. Rather, a plain reading of the two statutes of limitations demonstrates that the district court correctly applied the five-year limitations period. The ten-year limitations period in section 13–206 applies only to actions on written contracts or other written evidence of indebtedness; a breach of fiduciary duty claim is not such an action. Section 13–205 applies to all torts, actions on oral contracts, and "all civil actions not otherwise provided for." A breach of fiduciary duty claim is an action "not otherwise provided for" in the Illinois statutes of limitations. Also, Illinois and federal courts have applied the five-year statute of limitations to breach of fiduciary duty claims both before and after *Kinzer*. *See, e.g., Hernandez v. Childers*, 736 F.Supp. 903, 910 (N.D.Ill.1990); *Pucci v. Santi*, 711 F.Supp. 916, 927 (N.D.Ill.1989); *Luminall Paints, Inc. v. La Salle Nat'l Bank*, 220 Ill.App.3d 796, 163 Ill.Dec. 240, 244, 581 N.E.2d 191, 195 (1991); *Mitchell v. Simms*, 79 Ill.App.3d 215, 34 Ill.Dec. 536, 540, 398 N.E.2d 211, 215 (1979).

## B. Breach of Contract

■ In the sales agency agreement, Sumitomo agreed to provide Havoco with a $5.5 million, thirty-day revolving letter of credit. Havoco would draw on this credit to pay for the coal it purchased from R & F Coal. A "revolving" letter of credit is one which is automatically renewed without any additional action by the lender. That is, once Sumitomo posted the revolving letter of credit, Havoco would be able to collect up to $5.5 million every month without further approval by Sumitomo. Sumitomo did not post a revolving letter of credit. Rather, from March 1975 through February 1976, Sumitomo provided monthly, $5.5 million, non-revolving letters of credit. Each month, Sumitomo posted a new letter of credit, good for that month only. In March 1976, when Sumitomo discovered that coal shipments to the TVA had been suspended, the letter of credit it posted was for only $2 million.

Havoco's complaint alleges that Sumitomo breached the financing agreement by failing to post a revolving letter of credit. There is no question that Sumitomo breached the contract by providing non-revolving letters of credit instead of a revolving one. But, at trial, Sumitomo argued that Havoco waived the breach of contract claim by repeatedly accepting the monthly, non-revolving letters of credit. The jury agreed, finding in a special interrogatory that Havoco acquiesced in Sumitomo's breach. On appeal, Havoco argues that the facts proven at trial are not sufficient to constitute waiver. "The determination as to what facts are sufficient to constitute waiver is a question of law." *Whalen v. K–Mart Corp.*, 166 Ill.App.3d 339, 116 Ill.Dec. 776, 779, 519 N.E.2d 991, 994, *appeal denied*, 121 Ill.2d 587, 122 Ill.Dec. 448, 526 N.E.2d 841 (1988); *see also Community Convalescent Center v. First Interstate Mortgage Co.*, 181 Ill.App.3d 996, 130 Ill.Dec. 833, 835, 537 N.E.2d 1162, 1164 *appeal denied*, 127 Ill.2d 613, 136 Ill.Dec. 582, 545 N.E.2d 106 (1989).

■ Waiver is "an express or implied voluntary and intentional relinquishment of a known and existing right." *Whalen*, 116

**1338**

Ill.Dec. at 779, 519 N.E.2d at 994. "Waiver of a contractual provision may be established by conduct indicating that strict compliance with the provision will not be required." *First Interstate*, 130 Ill.Dec. at 835, 537 N.E.2d at 1164. In other words, "[w]aiver may be proven by words or deeds of the party against whom waiver is invoked that are inconsistent with an intention to insist on the party's contractual rights." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir.1985) (applying Illinois law).

The record in this case is replete with evidence of conduct by Havoco which is inconsistent with an intent to insist on strict compliance with the contract provision requiring Sumitomo to post a revolving letter of credit. Most important of this evidence is the fact that Havoco accepted (and received the benefits of) thirteen monthly, non-revolving letters of credit which Sumitomo posted from March 1975 through March 1976. Further, there is evidence in the record from which a reasonable juror could conclude that Havoco knew these letters of credit were not revolving. Havoco's president and chairman of the board, Barry VanderMeulen, read and initialed the first non-revolving letter of credit.[4] VanderMeulen protested that he could not tell whether this letter was revolving or non-revolving. However, Sumitomo's expert banking witness testified that any business which required the issuance of a letter of credit would have sufficient knowledge to distinguish between revolving and non-revolving letters of credit, and VanderMeulen admitted that the letters were reviewed by Havoco's financial department. Also, each letter of credit clearly states on its face that it is effective for one month only.

There is one fact in the record which supports Havoco's position that there was no waiver: In October 1975, Havoco demanded that Sumitomo post a revolving letter of credit. However, Sumitomo posted another non-revolving letter of credit several days after this demand and continued to post non-revolving letters of credit for the next three months. Havoco, although it certainly had knowledge that the letters were not revolving by this point, collected the funds without complaint. This one, rather half-hearted, complaint about Sumitomo's contract performance, followed as it was by four months of continued acceptance of non-conforming letters of credit, does not negate Havoco's otherwise continuous and knowing acceptance of the non-revolving letters of credit. In fact, "continuing to accept the breaching party's performance and the benefits thereof after learning of the breach" is itself sufficient evidence of waiver. *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir.1992) (interpreting Illinois law).

## II. Hill's Appeal

Defendant Hill raises four issues in his appeal, No. 91–1196. First, Hill argues that all of Havoco's claims against him are barred by a release that Havoco entered with R & F Coal. Second, Hill challenges the district court's jury instruction on his waiver defense. Third, Hill contends that there was insufficient evidence to support the jury verdicts against him on any of

**4.** We reject Havoco's argument that this first letter of credit, posted on March 11, 1975, and testimony regarding that letter was admitted into evidence in violation of the parol evidence rule. "Under the parol evidence rule, extrinsic evidence of a prior or contemporaneous agreement is not admissible to alter the terms of an instrument that appears complete, certain and unambiguous on its face." *Commonwealth Eastern Mortgage Co. v. Williams*, 163 Ill.App.3d 103, 114 Ill.Dec. 360, 365, 516 N.E.2d 515, 520 (1987); *see also Hartbarger v. SCA Services, Inc.*, 200 Ill.App.3d 1000, 146 Ill.Dec. 633, 638, 558 N.E.2d 596, 601 *appeal denied*, 135 Ill.2d 556, 151 Ill.Dec. 382, 564 N.E.2d 837 (Ill.1990). The March letter of credit is neither prior nor was it used to alter the terms of the sales agency agreement. The evidence at trial showed that the contract (dated March 3, 1975) was actually executed on March 10, 1975, and the letter of credit was posted the following day. The parties signed a retyped version (incorporating the handwritten changes on the March 10 contract) in April 1975. Sumitomo used the letter of credit to show the course of performance of the March 10 contract, not to vary the terms of that contract.

Havoco's claims or the jury's damage award. Fourth, Hill argues that the district court improperly cumulated the compensatory damage awards.

Hill's appeal forces us to do what this court has been able to put off until now; that is, discuss the events, as disclosed by the trial evidence, leading up to Havoco's assignment of the TVA contract to R & F Coal. According to the evidence as viewed most favorably to Havoco, this story of fraud and deceit began in March 1975, soon after Havoco began shipping coal to the TVA. Havoco's star witness, Fred Molitor, a former Havoco employee, testified that Hill, Molitor and William Spiker, president of R & F Coal, agreed from the very beginning to eliminate Havoco as the principal under the TVA contract. The reopened price negotiations with the TVA gave the conspirators a golden opportunity. Under the terms of the TVA contract, price negotiations would last for three months (or, until November 1975) and, if no agreement was reached, the TVA contract would lapse at its one-year anniversary, March 2, 1976. Hill, Spiker and Molitor agreed to withhold information from Havoco and negotiate in bad faith until the negotiations ended in failure. Then Havoco would be forced to assign the TVA contract to R & F Coal.

And that is what they did. The first price renegotiation meeting—attended by Hill, Spiker, Molitor and officials from the TVA—was held on September 13, 1975. The TVA opened the negotiations by asking that the price of the coal be lowered to $15/ton, an $8/ton reduction. Hill, negotiating on behalf of Havoco, rejected this offer but made no counteroffer. In fact, Hill did nothing for the next three months, except to get repeated extensions of the negotiation period. Hill finally made a counteroffer of $23/ton on December 15, 1975, but the TVA rejected the offer. During January 1976, negotiations continued to go badly, and Hill continued to withhold information about the negotiations from Havoco. On January 15, 1976, R & F Coal, through Spiker, made its first offer to buy the TVA contract from Havoco for $50,000. Havoco rejected the offer.

In early February 1976, Hill told Havoco's president, Barry VanderMeulen, that the TVA had decided it no longer wanted to do business with Havoco and that Havoco should assign the contract to R & F Coal. Upset by this news, VanderMeulen decided to talk to the TVA himself. VanderMeulen met with the TVA on February 19, 1976. At the meeting, the TVA told VanderMeulen that they did wish to continue the business relationship. Also, for the first time, VanderMeulen learned that a "final" negotiation meeting was set for the following day. In the meantime, Hill, Molitor and Spiker also met on February 19th and discussed forcing Havoco to assign the TVA contract to R & F Coal. Spiker offered to pay Hill a broker fee if R & F Coal got the contract.

The next day, February 20, 1976, VanderMeulen met Hill, Molitor and Spiker for breakfast. At the meeting, Spiker again offered to buy the TVA contract, this time for $0.25/ton of coal delivered to the TVA; VanderMeulen again refused to assign the contract. But, VanderMeulen was backed into a corner at the negotiation meeting with the TVA later that morning. Hill began the meeting by announcing that he had no proposal to make. The officials from the TVA were surprised by this, to say the least, and the meeting was temporarily adjourned. During the break, VanderMeulen and Spiker met in the hallway, and Spiker again made an offer for the contract. With nothing else to put on the bargaining table, VanderMeulen orally agreed to assign the contract, conditioned on R & F Coal's ability to reach an agreement with the TVA. When the meeting resumed, Hill announced the assignment and—now acting as an agent for R & F Coal—proceeded to make a detailed proposal which included temporarily reducing the amount of coal delivered per month, waiving contractual price escalations, and lowering the contract price to $19.50/ton. The TVA rejected this offer, and the meeting ended without an agreement between R & F Coal and the TVA.

On February 27, 1976, R & F Coal offered to reduce the price of coal to $19/ton; the TVA also rejected this offer and made

a counteroffer of $16.73/ton. On March 1, 1976, with the TVA contract about to expire, VanderMeulen notified R & F Coal that because R & F Coal had failed to reach an agreement with the TVA, the assignment of the TVA contract was not effective. VanderMeulen then ordered Hill to call the TVA and request a two-year suspension of deliveries and a thirty-day extension of negotiations. Hill made the call, and the TVA agreed. Coal shipments were suspended effective March 3, 1976; and negotiations were extended until April 1, 1976. If the TVA and Havoco did not reach an agreement, the contract would terminate on April 1.

This agreement was good news for Havoco, but events quickly took a turn for the worse. First, Sumitomo failed to post the March $5.5 million letter of credit needed to pay R & F Coal; instead, Sumitomo posted a letter of credit for only $2 million. Next, R & F Coal sent Havoco invoices for coal in the amount of $2.6 million and demanded immediate payment—although only $800,000 was currently due. Then, on March 4, 1976, Hill mailed his resignation letter to Havoco. VanderMeulen did not receive Hill's resignation until March 8th, when he immediately telexed a letter to the TVA terminating Hill as Havoco's agent. In the meantime, however, Hill had talked to the TVA several times without informing the TVA that he had resigned from Havoco. Hill twice told the TVA to do nothing about further negotiations because Havoco was finalizing the assignment of the contract to R & F Coal—although he knew that Havoco had repudiated the assignment. Hill also convinced the TVA to stop payments on the coal already delivered until matters were straightened out between Hill, Havoco, Sumitomo and R & F Coal. Finally, on March 15, 1976, R & F Coal filed suit in federal district court against Havoco, VanderMeulen personally and Havoco's bank for the $2.6 million Havoco allegedly owed

for coal. Because of this lawsuit, the bank froze all of VanderMeulen's personal and Havoco's corporate accounts.

On March 19, 1976—with the TVA contract about to expire, assets frozen, no financing and facing a $2.6 million lawsuit—VanderMeulen, acting for Havoco, met with Spiker and entered into three contracts. First, Havoco and R & F Coal entered an agreement settling the $2.6 million suit. Second, as required by this settlement agreement, Havoco assigned the TVA contract to R & F Coal. Third, Havoco executed a document, captioned "GENERAL RELEASE," in which Havoco agreed to "release and forever discharge" R & F Coal from "all manner of actions, cause, and causes of action, suits, debts, agreements, promises, claims and demands" that arose prior to March 19, 1976.

In the months after these documents were signed, Hill and Spiker, acting on behalf of R & F Coal, continued negotiations with the TVA. Eventually, R & F Coal entered a fifteen-year coal supply contract with the TVA. The TVA agreed to purchase from 20,000 to 50,000 tons of coal every month at prices from $21.50 to $22.85/ton. Hill received a commission of $0.40/ton of coal shipped by R & F Coal to the TVA.

## A. The Release

█ Hill's first argument on appeal is that the "GENERAL RELEASE" that Havoco entered into with R & F Coal bars all of Havoco's claims against him. Under Illinois law, a release of one joint tortfeasor releases all other joint tortfeasors. *Porter v. Ford Motor Co.*, 96 Ill.2d 190, 70 Ill.Dec. 480, 482, 449 N.E.2d 827, 829 (1983); *but see Batteast v. Wyeth Laboratories, Inc.*, 137 Ill.2d 175, 148 Ill.Dec. 13, 16, 560 N.E.2d 315, 318 (1990) (a "covenant not to sue" one joint tortfeasor does not release other tortfeasors).[5] In its com-

---

5. The confusing "release" versus "covenant not to sue" dichotomy established by Illinois courts was mercifully supplanted by the Illinois Joint Tortfeasor Contribution Act, Ill.Rev.Stat. ch. 70, §§ 300 *et seq.* Under that Act, neither a release nor a covenant not to sue releases other joint

tortfeasors from liability unless its terms explicitly so provide. Ill.Rev.Stat. ch. 70, § 302(c). Because the "GENERAL RELEASE" at issue in this case was executed in 1976, the Contribution Act does not apply. Ill.Rev.Stat. ch. 70, § 301

plaint, Havoco alleged that Hill, Sumitomo and R & F Coal were coconspirators and joint tortfeasors. Accordingly, prior to trial, the district court held that the "GENERAL RELEASE" not only released R & F Coal from all claims but, as a matter of law, also released Hill. The jury, however, found in special interrogatories that the release was unenforceable as a product of fraudulent inducement and duress, and the district court denied Hill's motion for judgment notwithstanding the verdict challenging the jury's findings. This Court recently articulated the standard for reviewing the denial of a JNOV motion in an Illinois diversity case:

> In diversity cases, state law governs the standard for entry of judgments notwithstanding the verdict. *A. Kush & Associates, Ltd. v. American States Ins. Co.*, 927 F.2d 929, 942 (7th Cir.1991). Under Illinois law, the trial court should not take a case away from the jury unless "all the evidence, when viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 514 (1967). We review the district court's denial *de novo* and apply for ourselves the *Pedrick* standard to the evidence on the record. *Eastman v. Chicago, Cent. & Pacific R.R. Co.*, 930 F.2d 1173, 1176 (7th Cir.1991).

*Trzcinski v. American Casualty Co.*, 953 F.2d 307, 313 (7th Cir.1992). The evidence on the enforceability of the "GENERAL RELEASE," when viewed most favorably to Havoco, does not "so overwhelmingly favor" Hill, and therefore, we must affirm the jury's findings on this issue.

*1. Fraudulent Inducement.*
A release is a contract, and "its construction is governed by the rules of law that prevail in contract cases." *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill.App.3d 435, 63 Ill.Dec. 168, 172, 437 N.E.2d 817, 821 (1982). As with any contract, "[a] release may be set aside if there is fraud in the inducement." *Phil Dressler & Assoc. v. Old Oak Brook Inv. Corp.*, 192 Ill.App.3d 577, 139 Ill.Dec. 629, 633, 548 N.E.2d 1343, 1347 (1989). The elements of fraudulent inducement, which Havoco had to prove by clear and convincing evidence, *Gutierrez v. Schultz*, 109 Ill.App.3d 372, 64 Ill.Dec. 899, 901, 440 N.E.2d 451, 453 (1982), are: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Cotter v. Parrish*, 166 Ill.App.3d 836, 117 Ill.Dec. 821, 824, 520 N.E.2d 1172, 1175 (1988). *See also Smith v. Ethell*, 144 Ill.App.3d 171, 98 Ill.Dec. 742, 743, 494 N.E.2d 864, 865 (1986). In addition, the omission or concealment of a material fact when, as in this case, the person has the opportunity and duty to speak also amounts to fraudulent misrepresentation. *Cotter*, 117 Ill.Dec. at 824, 520 N.E.2d at 1175; *Warren Chevrolet, Inc. v. Bemis*, 197 Ill.App.3d 680, 144 Ill.Dec. 204, 206, 555 N.E.2d 101, 103 (1990).[6]

Hill argues that, as a matter of law, Havoco could not have relied on the misrepresentations and omissions made by Hill and R & F Coal. It is true, as Hill points out, that Havoco had at least some knowledge of Hill's misrepresentations and omissions by the time it executed the settlement agreement, assignment contract

("This Act applies to causes of action arising on or after March 1, 1978.").

**6.** Hill, relying on *Bellefonte Re Insurance Co. v. Argonaut Ins. Co.*, 581 F.Supp. 241, 244 (S.D.N.Y.1984), *aff'd*, 757 F.2d 523 (2d Cir.1985), also argues that a release may not be avoided on the basis of the same conduct that was released. Hill contends that we must reverse the jury's verdict because any misrepresentations proved at trial related to the conduct that was released, not the negotiation and execution of the release.

Hill has not cited, and we cannot find, any basis for such a rule in Illinois law. Because our task is merely to apply existing Illinois law, we cannot create a new rule. In any case, we doubt that *Bellefonte* created such a broad rule. *See Bellefonte Re Insurance Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985) (recognizing that a release can be avoided where, as in this case, "the settlement or release had been part of the very transaction attacked as fraudulently induced").

and release on March 19, 1976. In *Havoco II*, we held that "there is no genuine issue of material fact concerning Havoco's knowledge of the alleged fraud when it assigned the TVA contract." 799 F.2d at 352. Specifically, we noted that:

> ... 1) in January, 1976, Havoco knew that Mr. Hill had recommended that R & F purchase the TVA contract; 2) by February 20, 1976, Havoco was aware that Mr. Hill had made misrepresentations and Mr. Van Der Meulen suspected and distrusted him; 3) at the February 20 meeting with the TVA, Havoco learned that Mr. Hill would represent R & F in negotiations with the TVA; 4) by March 5, 1976, Havoco was convinced that Mr. Hill was acting contrary to Havoco's interests; 5) in early March, 1976, Havoco was aware of and concerned about Sumitomo's cancellation of the revolving letter of credit and Havoco knew that neither Sumitomo nor Hill had disclosed vital financing information to the TVA.

*Id.* at 352 n. 4. It is also true that, as a general rule, knowledge of the falsity of a representation precludes a finding that a party reasonably relied on that representation. *Wilkinson v. Appleton,* 28 Ill.2d 184, 190 N.E.2d 727, 729 (1963) ("the party to whom [the misrepresentation] is made must be ignorant of its falsity").

Thus, Hill argues, Havoco did not prove reliance because it signed the contract knowing of the fraud. That argument, however, misconstrues the nature of Havoco's reliance. The reliance was Vander-Meulen's forbearance from conducting the negotiations himself with the TVA. The record shows that Havoco relied on Hill to negotiate with the TVA in good faith, to keep Havoco informed of all developments, and generally act in the best interests of Havoco. This, of course, Hill did not do. Rather, he conspired with R & F Coal to force Havoco to assign the contract. By the time Havoco began to discover the fraud in late February and early March 1976, it was too late—Havoco had already relied on the fraud to its detriment. The TVA had stopped accepting shipments of coal, and Sumitomo had failed to post the full $5.5 million letter of credit. R & F

Coal filed the $2.6 million lawsuit against Havoco, VanderMeulen and their bank, and the bank froze Havoco's corporate and VanderMeulen's personal assets. The TVA contract was about to lapse, and there was not enough time for VanderMeulen to negotiate an agreement with the TVA. Then, R & F Coal presented Havoco with the settlement agreement, the assignment contract and the release. This was an offer Havoco could not refuse. With the TVA contract about to lapse, Havoco had to assign the TVA contract to realize any benefit from it. If Havoco had not assigned the TVA contract, VanderMeulen testified, Havoco would have been "totally destroyed."

In other words, Hill made misrepresentations and omissions about the status of negotiations with the TVA. In reliance on those misrepresentations and omissions, VanderMeulen gave Hill a free hand in the negotiations and did not himself negotiate (or, indeed, have any contact) with the TVA on behalf of Havoco. Because of this reliance, and before Havoco knew of the fraud, it was forced into a corner: Havoco could not save the TVA contract; it had no choice but to sign R & F Coal's assignment contract, settlement agreement and release. The fact that Havoco discovered some of Hill's fraudulent acts shortly before signing those contracts, but after it had been forced into a position in which it could do nothing else, does not negate this detrimental reliance. By the time Havoco discovered the fraud, there was no way to avoid the damage. Havoco could only cut its loses by assigning the TVA contract to R & F Coal. Havoco cannot be barred from pursuing its claims against Hill simply because it attempted to mitigate the damages resulting from Hill's fraud.

*2. Duress.* The evidence also supports the jury's finding of duress. Under Illinois law, a contract is the product of duress if the wrongful acts of others "deprive one of the exercise of free will." *Enslen v. Village of Lombard,* 128 Ill.App.3d 531, 83 Ill.Dec. 768, 770, 470 N.E.2d 1188, 1190 (1984). That is, Havoco had to demonstrate that Hill's wrongful acts left it " 'bereft of the quality of mind essential to the

making of a contract,'" *Alexander v. Standard Oil Co.*, 97 Ill.App.3d 809, 53 Ill.Dec. 194, 198, 423 N.E.2d 578, 582 (1981) (quoting *Kaplan v. Kaplan*, 25 Ill.2d 181, 182 N.E.2d 706, 709 (1962)). "Duress does not exist, however, where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances *unless* the conduct of the party obtaining the advantage is shown to be tainted with some degree of fraud or wrongdoing." *Enslen*, 83 Ill.Dec. at 770, 470 N.E.2d at 1190 (emphasis added).

 In this case, Havoco established at trial that the fraudulent acts of Hill and R & F Coal left it with no choice but to assign the TVA contract to R & F Coal. Hill made misrepresentations and omissions about the status of negotiations with the TVA. By the time Havoco discovered the fraud, the TVA contract was about to lapse; and Havoco had no financing, frozen assets and was facing a $2.6 million lawsuit. Havoco was forced to capitulate. If it had not signed every document R & F Coal demanded on March 19th, Havoco would have had a $2.6 million liability and an expired, worthless contract. Vander-Meulen testified at trial that this would have totally destroyed Havoco. This evidence is sufficient to show that Hill's wrongful acts deprived Havoco of the exercise of free will. Because the release was a product of both fraudulent inducement and duress, it does not bar Havoco's claims against Hill.

### B. Jury Instruction

At trial, Hill put forth the affirmative defense that Havoco waived all of its claims against Hill when it assigned the TVA contract to R & F Coal. The jury rejected this defense, and the district court denied Hill's motion for a new trial challenging the jury instruction on waiver. The challenged instruction correctly defined waiver as an intentional relinquishment of a known right, stated that the defendants had the burden of proof, and told the jury that they *"must"* find in favor of the defendants if they found that "Havoco intended to relinquish the claims raised in the lawsuit." [7] On appeal, Hill contends that the judgment against him should be reversed and a new trial granted because the district court failed to instruct the jury that, as found in *Havoco II*, 799 F.2d at 352, Havoco had knowledge of the basis for its claims at the time of the assignment.

 "Even in a diversity case, our review of the district court's denial of a motion for a new trial is governed by federal law." *Trzcinski*, 953 F.2d at 315. Under federal law, "our review of jury instructions is limited to the determination of whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues." *Trustees of Indiana University v. Aetna Casualty & Surety Co.*, 920 F.2d 429, 437 (7th Cir.1990) (citation omitted). Hill is entitled to a new trial only if "the jury's understanding of the issues was seriously affected to the prejudice of the complaining party." *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 597 (7th Cir.1985).

 It is true that the district court failed to explicitly instruct the jury that the "known right" element of the waiver defense was satisfied. However, neither did the district court put the issue of Havoco's knowledge to the jury. Rather, only the issue of Havoco's intent was given to the jury. The district court's instruction on waiver, therefore, did not mislead the jury and gave the jury a sufficient understanding of the issue it had to resolve.

---

7. The district court instructed the jury that:

 Hill and Sumitomo allege that Havoco waived its right to pursue any of the claims raised against Hill and Sumitomo in this lawsuit. Waiver is the intentional relinquishment of a known right, either by word or by conduct. To prevail upon this affirmative defense, Hill and Sumitomo bear the burden of proving waiver by a preponderance of the evidence. If you find by a preponderance of the evidence that Havoco intended to relinquish the claims raised in the lawsuit, then you must find in favor of Hill and Sumitomo on each of the claims raised against them in this action. If you find that Havoco did not intend to relinquish the claims raised in this lawsuit, then you must find against Hill and Sumitomo on this affirmative defense.

Thus, reviewing the instruction as a whole, in a common sense manner, we conclude that the district court did not commit reversible error.

## C. Sufficiency of the Evidence

Hill next challenges the sufficiency of the evidence to support the jury verdicts against him on each of Havoco's claims and the jury's damage award. As noted above, under Illinois law, we can reverse a jury verdict only if " 'all the evidence, when viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.' " *Trzcinski*, 953 F.2d at 313 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 514 (1967)).

*1. Fraud and Conspiracy.* On the fraud and conspiracy to defraud claims, Hill argues that Havoco failed to prove the element of reliance because Havoco knew of Hill's fraudulent acts when it assigned the TVA contract to R & F Coal. This is the same argument that Hill put forth for reversing the jury's determination that the "GENERAL RELEASE" was fraudulently induced, and we reject it for the same reasons. The evidence at trial was sufficient to show reliance.

 *2. Tortious Interference with Contractual Relations.* Hill argues that the judgment against him on Havoco's tortious interference claim must be reversed because Havoco failed to prove that there was a breach of contract. The district court instructed the jury that Havoco had to prove, by a preponderance of the evidence, that Hill's wrongful conduct caused the TVA to breach its contract with Havoco. *See Delcon Group, Inc. v. Northern Trust Corp.*, 187 Ill.App.3d 635, 135 Ill. Dec. 212, 221, 543 N.E.2d 595, 604 *appeal denied*, 128 Ill.2d 672, 139 Ill.Dec. 511, 548 N.E.2d 1067 (Ill.1989). Once the wrongful inducement is shown, any breach of contract, no matter how small, is sufficient to satisfy the actual breach element of tortious interference. *Certified Mechanical Contractors, Inc. v. Wight & Co.*, 162 Ill.

App.3d 391, 113 Ill.Dec. 888, 893, 515 N.E.2d 1047, 1052 (1987).

 Havoco points to two breaches of the contract by the TVA which are supported by the evidence. First, in response to the telephone calls from Hill on March 5 and 8, 1987, and despite an offer by Havoco which was still on the bargaining table, the TVA did not negotiate with Havoco during the final few days of the renegotiation period. Second, on March 9, 1976, after the TVA learned that Hill no longer represented Havoco, the TVA agreed with Hill that it would not pay for the coal it had already received until Sumitomo's status as Havoco's agent was clarified. Although these two breaches are minor, they are sufficient to satisfy the breach of contract element of the tortious interference claim.

 In addition, although the jury was not so instructed, we agree with Havoco that the verdict is also sustainable because a tortious interference claim in Illinois "encompasses the situation in which the defendant prevents the plaintiff from performing the contract." *Scholwin v. Johnson*, 147 Ill.App.3d 598, 101 Ill.Dec. 67, 73, 498 N.E.2d 249, 255 (1986), *appeal denied*, 113 Ill.2d 585, 106 Ill.Dec. 56, 505 N.E.2d 362 (1987); *see also George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1331 (7th Cir.1983) (under Illinois law, the breach element of tortious interference requires "either a breach of contract, termination of contractual relations, or *rendering performance impossible* ") (emphasis added). The Illinois court in *Scholwin* adopted section 766A of the *Restatement (Second) of Torts* which states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [the plaintiff] and a third person, by preventing the other [the plaintiff] from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other [the plaintiff] for the pecuniary loss resulting to him.

101 Ill.Dec. at 73, 498 N.E.2d at 255. This is exactly what happened here: Hill's

fraudulent conduct made it impossible for Havoco to reach an agreement with the TVA and thus retain the contract.

**3. Breach of Fiduciary Duty.** On the breach of fiduciary duty claim, Hill argues that Havoco failed to prove that Hill's fraudulent acts proximately caused Havoco to lose the TVA contract. Hill contends that Havoco would have lost the TVA contract anyway because it could not have met the TVA's price demand. Hill's argument misses the point. The damage alleged by Havoco is not the loss of the TVA contract itself, but the assignment of the TVA contract for less than its fair value. There is plenty of evidence in the record to support the finding that Hill's breach of fiduciary duty (including his conspiracy with R & F Coal) destroyed Havoco's bargaining position with R & F Coal and the TVA, forcing it to assign the contract for less than its fair value. Indeed, even R & F Coal's own offer to Havoco for the TVA contract decreased by about one-third from February 20 to March 19, 1976.

In any case, the evidence does not support Hill's contention that Havoco would have lost the TVA contract despite his breach of fiduciary duty. The TVA initially demanded that the price of coal be reduced to $15/ton. Later, the TVA raised its offer to $16.73/ton. The lowest offer Hill made—while negotiating in bad faith with the TVA—was $20/ton. However, VanderMeulen testified that, in order to preserve the contract, Havoco was willing to go lower (maintaining the standard price escalators), even if that meant taking a short-term loss. The TVA eventually agreed to pay R & F Coal from $21.50 to $22.50/ton. A price of $15 or $16.73/ton would certainly have meant a loss for Havoco. But, given Havoco's previous offer of $20/ton, the jury was free to believe that Havoco would have accepted a price of $21.50 to $22.50/ton.

**4. Damages.** Finally, Hill argues that the evidence in the record is insufficient to support the compensatory damage award of $14,250,000. Havoco asked the jury to award lost profits. Under Illinois law, it is not necessary to prove lost profits with "absolute certainty." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 113 Ill.Dec. 252, 257, 515 N.E.2d 61, 66 (1987). While an award for lost profits "cannot be based upon conjecture or sheer speculation," mathematical precision is not possible or required. *Id.* Rather, "a recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty." *Id.* (citation omitted). Hill contends that there is no reasonable basis for the jury's award of lost profits because Havoco would not have realized any profits had it continued under the TVA contract.

There are facts on the record to support Hill's contention that the TVA contract was a risky business with uncertain returns. However, there are also facts on the record from which the jury could have found and calculated its lost profits award of $14,250,000 with reasonable certainty. After all, even with the help of the fraud, R & F Coal paid Havoco $3,000,000 for the contract; thus, it obviously believed that the contract could be profitable. In addition, since R & F Coal eventually entered a profitable, long-term coal supply contract with the TVA, a reasonable jury could believe that Havoco would also have been able to successfully negotiate with the TVA absent Hill's and R & F Coal's fraud.

Havoco asked for damages based on its profit margin in the original TVA contract of $0.90/ton, or about $40 million. The jury rejected this calculation, and properly so. The evidence at trial demonstrated that there was little chance that Havoco could have continued to receive profits of $0.90/ton. But, a reasonable jury could calculate lost profits based on the difference between the assignment price and the fair market value of the TVA contract. VanderMeulen testified that the fair market value of the TVA contract was the $0.50/ton of coal shipped that he originally demanded from R & F Coal for the assignment; since R & F Coal shipped 44,560,000 tons of coal to the TVA, the fair market value of the contract is reasonably calculated at $22,280,000. Less the $3,000,000 as-

signment price, Havoco's lost profits would be $19,280,000. At the very least, the jury could have awarded the difference per ton between R & F Coal's offer for the TVA contract on February 20 ($0.25/ton on 44,-560,000 tons shipped) and the price Havoco actually received for the assignment ($3,000,000), or about $8 million. The jury's lost profits award, obviously, falls somewhere between $0.50/ton and $0.25/ton. But, as the above options demonstrate, it was not based on conjecture; rather, it involved simple, concrete number-crunching.

### D. Cumulation of the Damage Awards

█ The district court cumulated the jury's award of compensatory and punitive damages on each of the four counts and awarded a total of $15 million. Hill contends that this was improper, entitling him to a new trial on damages. Hill relies on *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1551 (7th Cir.1990). *Astor* and the one case it cites, *Watts v. Laurent*, 774 F.2d 168, 175–81 (7th Cir.1985), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986), stand for the basic proposition that a plaintiff can only be compensated once for one injury. *See Watts*, 774 F.2d at 179. In *Astor*, as in this case, the jury found for the plaintiff and awarded damages on four counts; the judge cumulated the damage awards and entered judgment for the total amount. This court struck down the damage award and ordered a new trial because the jury was never instructed that "it must calculate damages independently on each theory." 910 F.2d at 1551. Thus, in that case, it was impossible to tell whether the jury independently calculated the damages on each count or whether it apportioned the total damages among the different counts believing the judge would add them together.

This case is different from *Astor* because the jury was given an instruction about cumulation of the damage awards. The district court, in an instruction offered by *Hill*, told the jury: "Havoco seeks recovery for the same injury in more than one of its claims against Hill. You are instructed that if you have occasion to consider damages against Hill under more than one of Havoco's claims, you should not make duplicate damages awards for the same injury." Since "[w]e normally presume that juries follow the court's instructions," *United States v. McKinney*, 954 F.2d 471, 478 (7th Cir.1992), we must presume that the damages the jury awarded on each of the four counts are not duplicative awards for the same injury, and thus cumulation of the awards was proper.

### III. Conclusion

For the foregoing reasons, the judgments for Defendant Sumitomo Shoji America, Ltd. and against Defendant Elmer C. Hill are

AFFIRMED.[8]

**8.** Havoco raised three issues in a cross-appeal against Hill, No. 91–1279. Even if this court reversed the jury's verdict, Havoco argued, it is entitled to a new trial because the district court erred in refusing Havoco's proposed jury instructions on release, tortious interference with prospective economic advantage, and the elements of damage. Because we affirm the judgment against Hill, it is unnecessary for us to consider the issues raised in Havoco's cross-appeal.