**Darrell WILLIAMS, Plaintiff–Appellant,**

v.

**SHELL OIL COMPANY, Defendant–Appellee.**

No. 93–1745.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1993.

Decided March 2, 1994.

William J. Meacham, Edwardsville, IL (argued), for plaintiff-appellant.

Vincent H. Venker, II, Kathy A. Wisniewski, Coburn & Croft, St. Louis, MO, Thomas M. Zulim (argued), Chris Butler, Shell Oil Co., Legal Dept., Houston, TX, for defendant-appellee.

Before BAUER and FLAUM, Circuit Judges, and ROSZKOWSKI, District Judge.*

---

* Hon. Stanley J. Roszkowski, District Judge of the Northern District of Illinois, Western Division, sitting by designation.

ROSZKOWSKI, District Judge.

The plaintiff, Darrell Williams ("Williams"), appeals from the district court's dismissal of his action after granting the defendant, Shell Oil Company's ("Shell"), motion for judgment as a matter of law.

The plaintiff, Williams, alleged that he was wrongfully terminated by Shell Oil, and, alternatively, that Shell wrongfully interfered with his employment relationship. The plaintiff filed his action in the Illinois Circuit Court and the defendant removed the action to the United States District Court for the Southern District of Illinois based on diversity of citizenship. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## I.

In September 1989, Darrell Williams was a laborer hired by ANCO Insulators, Inc. ("ANCO") through the local laborer's union. ANCO was contracting for Shell Oil to do a project referred to as a "cat cracker turnaround job" at Shell's Wood River Manufacturing Complex at Wood River, Illinois. This project involved shutting down the refinery's catalyst cracking unit in order to perform maintenance. ANCO's part in the project consisted of removing and replacing large amounts of a chemical catalyst from the catalyst cracking unit. The catalyst used at the refinery is a fine, powdery substance, used in the manufacture of various petroleum fuels. Removal of the catalyst requires the workers to be exposed to heavy concentrations of the catalyst.

Shell states that this turnaround job lasted from September 16, 1989, to September 19, 1989, at which time ANCO laid off the employees it had engaged for the job. The plaintiff disputes the length of the job, but agrees that the other employees were laid off, at least on a temporary basis.

The plaintiff was referred to ANCO by the union. He reported to the ANCO on-site office at the refinery and was hired by ANCO. To enter the refinery, the plaintiff went to the contractor's gate, signed in, and was issued a pass identifying him as an ANCO employee. From the gate, an ANCO supervisor took him to ANCO's office, where he filled out several employment forms, and was issued safety equipment and ANCO guidelines. The plaintiff and other ANCO laborers were then taken to the worksite. There ANCO supervisors or foremen would instruct the laborers and set them to work. Additionally, there were occasions when Shell supervisors would direct the workers, and the workers had been previously instructed to follow such directions. At the end of the work shift, an ANCO supervisor or foreman would again take the workers back to the ANCO on-site office to change clothes, and then to the contractor's gate to exit.

Prior to the September 1989 turnaround job, there were two incidents at the refinery in which some of the catalyst was released into the air. Apparently, a cloud of catalyst blew over the neighboring area where the plaintiff resided. After those incidents, but before he was employed for the turnaround job, the plaintiff complained to Shell, and in the public, expressing a strong health concern about exposure to the catalyst. He complained of congestion, headaches, sores, burning eyes and skin, and hair loss. Shell encouraged the plaintiff to seek medical attention at its cost, which the plaintiff did. Subsequently, the plaintiff got his job with ANCO and began working with the catalyst.

At the time, Shell was not aware of the plaintiff working at the refinery. However, on the morning of September 19, 1989, Shell learned of the plaintiff's employment. A Shell supervisor asked the plaintiff if he felt exposure to the catalyst was bad for him, and if he did not believe it was bad, would he sign a release to that effect. The plaintiff stated he didn't know what the effects were, and, therefore, he would not sign a release. Shell thereupon directed ANCO to remove the plaintiff from the turnaround job. There was no other job for the plaintiff at the refinery where he could be assured of no exposure to the catalyst, and, apparently, ANCO had no other available jobs for him. Therefore, the plaintiff was laid off that morning.

The plaintiff then filed an action against Shell Oil in the Illinois state court. The defendant removed the action to federal

court based on diversity of citizenship. In his complaint, the plaintiff alleged, first, that due to the nature and degree of control Shell had over ANCO and its employees, including him, he was a loaned servant to Shell, and that Shell had wrongfully discharged him. He contended that because he had expressed a health concern about the exposure to the catalyst compound, his termination was in violation of his rights under, and the public policy behind, the Workers' Compensation Act of Illinois. 820 ILCS 305/1 *et seq.* Alternatively, he alleged that Shell had tortiously interfered with his employment relationship with ANCO.

At the final pretrial conference, the district court granted the defendant's motion for judgment as a matter of law. In a written opinion, the district court, relying on *Occidental Fire & Casualty Co. v. International Ins.*, 804 F.2d 983, 992–93 (7th Cir.1986), and *Richard v. Illinois Bell Tel. Co.*, 66 Ill. App.3d 825, 23 Ill.Dec. 215, 222, 383 N.E.2d 1242, 1249 (1978), found the uncontroverted facts established that the plaintiff could not maintain an action for retaliatory discharge as a matter of law. *Occidental* and *Richard* stand for the proposition that one cannot be considered a loaned servant unless the power to control the employee is totally given over to the second employer.

As to the claim for tortious interference with employment or contractual relations, the court found the plaintiff was an at will employee and had no enforceable contract rights. The court further found that because Shell was both the party charged with tortious interference and the party for whom the work was being performed that "[c]ertainly that party ought to have a say as to who will be doing the work." *Williams v. Shell Oil Co.*, No. 90 C 3390, slip op. at 3 (S.D.Ill. Jan. 27, 1993) (quoting *Lusher v. Becker Bros., Inc.*, 155 Ill.App.3d 866, 108 Ill.Dec. 748, 750, 509 N.E.2d 444, 446, leave to appeal denied, 115 Ill.2d .542, 110 Ill.Dec. 458, 511 N.E.2d 430 (1987)).

## II.

■ A district court's grant of judgment as a matter of law is reviewed de novo. *Hayes v. Otis Elevator Co.*, 946 F.2d 1272, 1275 (7th Cir.1991). Under diversity jurisdiction, the standard for a directed finding is determined by the law of the state in which the court is sitting. The Illinois standard allows a court to make a directed finding when there are no substantial factual disputes. *Davis v. FMC Corp.*, 771 F.2d 224, 229 (7th Cir.1985); *Pedrick v. Peoria & Eastern Railroad Co.*, 37 Ill.2d 494, 229 N.E.2d 504 (1967). A directed verdict is proper if "all the evidence when viewed in its aspect most favorable to the opponent so overwhelmingly favors movant, that no contrary verdict based on that evidence could ever stand." *Pedrick*, 229 N.E.2d at 514; *Darnell v. Impact Industries, Inc.*, 105 Ill.2d 158, 85 Ill.Dec. 336, 338, 473 N.E.2d 935, 937 (1984).

## III.

The district court found that the plaintiff had not established he was an employee of Shell for the purposes of raising a claim of retaliatory discharge. To state a claim for retaliatory discharge, "a plaintiff must show that he was 1) discharged; 2) in retaliation for his activities; and 3) that the discharge violated a clear mandate of public policy." *Wieseman v. Kienstra, Inc.*, 237 Ill.App.3d 721, 178 Ill.Dec. 603, 605, 604 N.E.2d 1126, 1128 (1992), leave to appeal denied, 148 Ill.2d 654, 183 Ill.Dec. 32, 610 N.E.2d 1276 (1993) (citing *Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 116 Ill.Dec. 694, 519 N.E.2d 909 (1988)). This tort was first recognized by the Illinois Supreme Court in *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978), and is a limited exception to "the general rule that an 'at-will' employee can be discharged at any time for any cause." *Thomas v. Zamberletti*, 134 Ill.App.3d 387, 89 Ill.Dec. 387, 388, 480 N.E.2d 869, 870 (1985).

The first element that the plaintiff must establish in order to support a claim for retaliatory discharge, is that he was discharged by the defendant. Williams acknowledges that he was discharged, although he asserts only nominally, by ANCO. The plaintiff argues that he was a loaned employee from ANCO to Shell, such that Shell was his employer for the purposes of this action.

■ The loaned servant doctrine is a principle of agency law in which the first principal "loans" his agent to a second principal, giving the second principal a heightened degree of control over the agent, along with the corresponding responsibility for the agent's acts and omissions. The use of the loaned servant doctrine in Illinois has generally been limited to instances in which the agent, or employee, "is wholly free from the control of the first employer and wholly subject to the control of the second employer." *Richard v. Illinois Bell Tel. Co.*, 23 Ill.Dec. at 222, 383 N.E.2d at 1249 (citations omitted); *see also Occidental Fire & Casualty Co. v. International Ins.*, 804 F.2d at 992–93. Generally, whether an employee is "loaned" is a factual question, and the factors considered in the control of an employee include such things as the power to hire and fire the employee and the power to control the direction and manner of performance of the work done by the employee. However, the court must first determine the degree of control, if any, left with the first employer that Illinois law requires before an employee can be said to be loaned to another employer. In other words, does Illinois require the first employer to totally relinquish control over the employee to the second employer, or can there be shared control, making both employers potentially liable.

The plaintiff argues that Illinois recognizes limited circumstances of joint control where liability can be placed on the second employer. The defendant contends that the tort of retaliatory discharge is of limited scope in Illinois and applies only to the employee's actual employer. This still begs the question, however, of who is the plaintiff's actual employer, ANCO, the nominal employer, or, as the plaintiff argues, Shell, by a loaned servant analysis or joint employment analysis.

The plaintiff points to *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974), which looked to common law principles to determine whether a worker for a contractor to a rail carrier could be "employed" by the rail carrier for purposes of the Federal Employers' Liability Act ("FELA"). The Court noted that there are three general methods under common law principles to establish employment under FELA. *Id.* at 324, 95 S.Ct. at 476. "First, the employee could be serving as the borrowed servant of the railroad at the time of his injury ... Second, he could be deemed to be acting for two masters simultaneously ... Finally, he could be a subservant of a company that was in turn a servant of the railroad." *Id.* (citations omitted). There is also some support for the adoption of these methods of analysis in Illinois. *See American Stevedores Co. Inc. v. Industrial Commission*, 408 Ill. 445, 97 N.E.2d 329 (1951) (and citations therein) (dual employment when both employers have substantial right of control); *see also Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, 1307 (7th Cir.1993) (district court instructed to consider Indiana doctrine of dual employment on remand.)

■ In addressing the three elements in this case, we must first consider the application of the loaned servant doctrine. Here, the issue of whether the plaintiff was a loaned servant is a close question. Although there is strong evidence supporting the district court's conclusion that ANCO was the plaintiff's sole employer, we are hesitant to conclude that as a matter of law because it is such a fact intensive question. Both Shell and ANCO apparently followed a strict "chain of command" for the most part in giving work orders. However, Shell supervisors kept a close eye on the work and the plaintiff alleges they were not hesitant to take command at times and direct the contractor's workers. Based upon the district court's consideration only of the loaned servant doctrine, requiring total power of control, and not dual employment which allows for shared control, we believe that the plaintiff would be entitled to have a trial on the issue of employment if he can sustain a cause of action as to each remaining element for the tort of retaliatory discharge.

■ The second element of retaliatory discharge is that the plaintiff be discharged in retaliation for his activities. That element may have been satisfied because the plaintiff was discharged for his refusal to sign the release presented to him by Shell.

The third element of retaliatory discharge is that the discharge be against clear public policy. In other words, assuming that Shell was the employer, was the plaintiff's discharge justified. In *Kelsay,* the Illinois Supreme Court created the tort and found that the plaintiff was fired for filing a workers' compensation claim. The court found that action against the clear public policy of Illinois to protect workers who are injured on the job, and to afford them proper compensation for their injuries.

The plaintiff contends that his discharge was against that same public policy. Williams states that by requiring him to sign a waiver form, waiving any claims for injury due to exposure to the catalyst, Shell impermissibly encroached on his rights under the Workers' Compensation Act if he should have an injury due to the catalyst. He argues that such a waiver would be an immediate violation of his rights under the Illinois Workers' Compensation Act.

In response, the defendant asserts that no public policy was violated by the plaintiff's discharge. Shell argues that absent an actual injury which could result in a workers' compensation claim, the policy behind workers' compensation does not come into play.

In *Wieseman v. Kienstra, Inc.,* 237 Ill. App.3d 721, 178 Ill.Dec. 603, 604 N.E.2d 1126, the Illinois Appellate Court affirmed the dismissal of Wieseman's claim of retaliatory discharge for failure to state a cause of action. The plaintiff alleged he was discharged after reporting for work and undergoing a physical examination. The examination revealed that the plaintiff had a pre-existing condition in one knee. The plaintiff alleged that due to this condition, the defendant discharged him because he might have a future knee injury leading to a claim for workers' compensation. *Id.* 178 Ill.Dec. at 605, 604 N.E.2d at 1128. The court found his complaint failed to state a cause of action because he was not discharged for his activities, nor was his discharge in violation of a clear public policy. The court first found that the plaintiff did not allege any activity he performed which would have given the defendant a retaliatory motive to fire him. The plaintiff did not file a workers' compensation claim against the defendant, and he did not allege that he sustained a work related injury, for which he sought medical treatment. Second, the court found that the policy of the Workers' Compensation Act did not come into play in that case. "The Act is to provide payment of compensation and medical expenses for an employee *injured* at work. The Act does not apply to anticipated future injuries, and an employee's rights under the Act accrue only at such time when a work-related injury occurs." *Id.* 178 Ill.Dec. at 606, 604 N.E.2d at 1129 (emphasis in original).

The *Wieseman* court found that since the plaintiff had not suffered any injury, his discharge did not violate any public policy and he had no accrued rights under the Workers' Compensation Act. Therefore, the plaintiff was employed at will and could be terminated for any reason. The court further stated in *dicta* that "it would be poor policy to force an employer to keep an employee at a job that ultimately might cause the breakdown of the physical structure of plaintiff's knees ... in this case the employer is causing the employee to seek a less strenuous job so that he might not have to undergo rehabilitation." *Id.*

Based upon our review of Illinois law, we find that Illinois does not recognize a violation of the public policy supporting the Workers' Compensation Act, where the employee in question had no present rights under the Workers' Compensation Act. The Act does not apply to future injuries or even anticipated injuries. Compensation is available to those workers who have been injured. Because the plaintiff had not suffered a work related injury, and had not sought medical treatment or filed a compensation claim, his discharge did not violate public policy.

### IV.

The plaintiff's second claim is that Shell tortiously interfered with his employment relationship with ANCO. Again, the plaintiff argues that Shell's actions were in derogation of his rights under the Illinois Workers' Compensation Act.

■ To establish a prima facie action for tortious interference with a contractual relationship, a plaintiff must prove: 1) the existence of a valid and enforceable contract between the plaintiff and another party; 2) that the defendant was aware of the contractual relationship; 3) an intentional and unjustified inducement of a breach of the contract by the defendant; 4) the subsequent breach of the contract by the other party, caused by the defendant's inducement; and 5) damages. *Lusher v. Becker Bros., Inc.*, 155 Ill.App.3d 866, 108 Ill.Dec. 748, 749, 509 N.E.2d 444, 445 (1987) (citing *J.E.L. Realtors, Inc. v. Mettille*, 111 Ill.App.3d 987, 67 Ill.Dec. 514, 444 N.E.2d 750 (1982); and *Beldon Corp. v. Internorth, Inc.*, 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98 (1980)). An oral at-will contract can be a valid contract in an action of tortious interference. *Lusher*, 108 Ill.Dec. at 749, 509 N.E.2d at 445. However, "[t]he question presented . . . is whether protection of the particular contractual interest at issue merits prohibition of the particular conduct at issue." *Id.* At issue here is whether the defendant intentionally and unjustifiably induced ANCO to breach the plaintiff's employment contract.

In *Lusher*, the Illinois Appellate Court affirmed the dismissal of Lusher's action for tortious interference with a contract. 108 Ill.Dec. 748, 509 N.E.2d 444. The plaintiff had an ongoing employment relationship with Dougherty Company as a sheet rock hanger. Dougherty was negotiating with the defendant, Becker Bros., for subcontracting work, which included the hanging of sheet rock, and which normally would have included Lusher's work. During the negotiations, agents of Becker Bros. told Dougherty Company that to obtain the contracts, Dougherty would have to agree not to employ Lusher on those jobs. Apparently, there was some animosity between one of Becker's agents and Lusher because Lusher had married the agent's former wife. *Id.*, 108 Ill.Dec. at 749, at 445. Lusher alleged that the comments against him were unjustified and made with intent to harm him and that but for those comments he would have been employed by Dougherty for those jobs.

The court found that the plaintiff's complaint failed to state a cause of action. The plaintiff failed to allege that there was an existing contract between him and Dougherty because he only worked from job to job, and was not working for Dougherty when the negotiations took place.

Lusher's second argument was that Becker Bros. tortiously interfered with his ongoing business relationship. The court found there was no precedential basis for the plaintiff to reasonably expect to work on the defendant's jobs. Although he may have had an expectation to continue his relationship with Dougherty, he had no expectation to do subcontracting jobs for the defendant. The court noted the unique circumstances of the case stating, "[h]ere, the party charged with tortious interference is also the party for whom the work is to be performed. Certainly that party ought to have a say as to who will be doing the work." *Id.* 108 Ill.Dec. at 750, 509 N.E.2d at 446.

■ The plaintiff argues that he has a contractual interest in continued employment by ANCO on its job at the Shell refinery. The circumstances here, however, do not support such an interest. Williams does not claim he had an ongoing relationship with ANCO, but only that he was referred by his union for work, without any expectancy as to the type or duration of the work.

Although exposure to the catalyst is apparently safe when proper precautions are taken, Williams did allege he had an adverse reaction to it after Shell's accidental release of it into the atmosphere. Shell's actions were certainly taken to protect its own interests from being sued, but also to protect Williams.

■ Shell argues that its actions were privileged. Illinois courts have recognized a privilege in intentional interference with contract cases when the defendant acts to protect an interest "which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care v. Mt. Vernon Hosp.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 24, 545 N.E.2d 672, 677 (1989) (citations omitted). Further, where a defendant's conduct is alleged to be privileged, it is the

plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious. *Id.* "The term 'malicious,' in the context of interference with contractual relations cases, simply means that the interference must have been intentional and without justification." *Id.*

We believe Shell was privileged in its actions. Shell had an interest in its contractual relationship with ANCO, and a strong interest in seeing that the work done at the refinery was done properly and safely. Shell was acting to insure the quality of the work done at the refinery and to protect the health and safety of the workers on its premises. Therefore, Williams must establish that the defendant's conduct was unjustified.

To establish that the defendant's conduct was unjustified, the plaintiff must show conduct "which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." *Id.* 137 Ill.Dec. at 25, 545 N.E.2d at 678. The plaintiff has failed to establish that the defendant's conduct was not privileged. Shell has an interest in insuring the health and safety of those working on its premises. As part of that interest, Shell can act to keep an individual like Williams from exposure to a material which he believed was injurious to his health. As such, Shell has not acted contrary or "antagonistic" to its interests and did act under a privilege.

## V.

Although there is an issue of who was Darrell Williams' employer for the purposes of retaliatory discharge, there was no public policy violated by his discharge. Shell did not tortiously interfere with his employment relationship. Williams was an employee at will. His interest in his contractual relationship did not override Shell's privilege to protect its interests. The district court properly granted the defendant judgment as a matter of law and the judgment is affirmed.

AFFIRMED.