In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 23-1345

AVANZALIA SOLAR, S.L., *et al.*,

*Plaintiffs-Appellants*,

*v.*

GOLDWIND USA, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-05035 — **Matthew F. Kennelly**, *Judge*.

---

ARGUED NOVEMBER 8, 2023 — DECIDED JULY 22, 2025

---

Before ROVNER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. Appellants, Avanzalia Panamá and its indirect parent company Avanzalia Solar, invested in and built a solar plant in Panama. For years, they endeavored to connect that solar plant to an electrical substation needed to sell electricity. Their quest took them from Panama's administrative agencies to our federal courts, where their cause was lost on summary judgment. On appeal, they

ask us to resolve three questions: one, whether the district court was correct to afford comity to a Panamanian administrative agency decision; two, whether the district court properly applied collateral estoppel to bar claims related to that decision; and three, whether the district court erred in disposing of their tortious interference claims as a matter of Illinois state law. We affirm on the first two questions and remand for further proceedings on the third.

## I

We recount the facts in the light most favorable to the solar plant owners as the party opposing summary judgment. *See Johnson v. Edward Orton, Jr. Ceramics Found.*, 71 F. 4th 601, 609 (7th Cir. 2023).

### A. Avanzalia's Conflict with Goldwind

#### 1. *The Parties & Their Projects*

The plaintiffs (together "Avanzalia") are Avanzalia Panamá, S.A., a Panamanian corporation that owns a large solar power plant, and Avanzalia Solar, S.L., its Spanish affiliate that invested in the construction of the plant. The defendant is Goldwind USA, Inc., a Chinese-owned Delaware corporation that sells wind turbines and is headquartered in Chicago, Illinois.

In 2010, Unión Eólica Panameña ("UEP") began developing a large Panamanian wind farm, part of which would one day include the El Coco substation (substations are facilities that serve as a junction between electricity-generating stations and consumers). Starting in 2012, UEP subdivided the wind project into parcels owned by UEP, UEPI, and UEPII. That process involved transferring UEP's ownership of the planned El Coco substation parcel to UEP Penonomé I

("UEPI"), Goldwind's Panamanian affiliate and alter-ego. UEPI was established as a special-purpose vehicle to construct the El Coco substation. In 2014, after the parcels were split up, UEP, UEPI, and UEPII entered an agreement to limit the access of other market agents, such as Avanzalia, to the El Coco substation if that access would affect the substation's capacity available to their own projects.

To broadly summarize the controversy here: In 2015, Avanzalia sought to connect its own recently developed power plant to the El Coco substation, which was the closest and only authorized substation through which the plant could connect to the national grid. To do so, it contacted UEP under the assumption that UEP still owned the substation. As alleged in Avanzalia's complaint, Goldwind then tortiously blocked Avanzalia's access to the substation by directing UEPI from Chicago to act in ways that violated Panamanian law and prevented Avanzalia from selling electricity on the open market and performing its own contractual obligations as an electricity provider.

2. *Panama's Framework for the Provision of Electricity Services*

Autoridad de Servicios Públicos ("ASEP") is the administrative agency that regulates public services, including electricity, in Panama. Panamanian law empowers ASEP to issue regulations, manage regulation compliance, impose sanctions, resolve conflicts, and issue orders and resolutions. ASEP also issues "definitive licenses" to providers wishing to build, operate, and generate electricity from power plants.

Empresa de Transmisión Eléctrica ("ETESA") is Panama's government-run utility company tasked with managing the

nation's power grid. Any entity seeking to connect to Panama's grid must seek a "certificate of viability" from ETESA. Entities seeking to connect to the grid through a substation not owned by ETESA must complete the following process to obtain a certificate: (i) send the substation owner electrical studies showing the impact of the proposed connection on the substation and grid, and execute a contract (an "access agreement") with the substation owner; (ii) submit the electrical studies and the executed access agreement to ETESA; and (iii) wait for ETESA to send the electrical studies to the substation owner for comment. Panamanian regulations state that substation owners with "remaining capacity" cannot reject a request for access, "except [when the requesting entity is] in breach of the requirements set out in [the] [r]egulation[s]."

### 3. *Avanzalia Endeavors to Establish a Power Plant*

After a year spent consulting with an electrical engineer and gathering the necessary paperwork, Avanzalia finally obtained everything that it thought was necessary to operate its power plant. That included a definitive license from ASEP and a certificate of viability from ETESA. ETESA's certificate of viability required Avanzalia to connect its power plant to the nation's grid through the El Coco substation. So, in August 2015, with those documents in hand, Avanzalia reached out to UEP hoping to negotiate an access agreement.

### 4. *Avanzalia's Endeavors Hit a Snag*

That same month, UEP informed Avanzalia that it would not grant the solar plant an access agreement because certain regulatory requirements had been violated. Specifically, UEP asserted that Avanzalia's viability certificate was issued in error because ETESA failed to first confirm that Avanzalia

successfully obtained an access agreement from UEPI and failed to send Avanzalia's electrical studies to UEPI for comment. Avanzalia countered that those requirements were not necessary because ETESA had concluded that the substation had "remaining capacity." The following month, UEPI told Avanzalia that it would need to provide UEPI with copies of the missing electrical studies to move forward with an access agreement.

### B. Administrative Recourse and Ensuing Litigation

#### 1. *Foreign Administrative Proceedings*

In early 2016, Avanzalia filed a complaint with ASEP seeking the agency's intervention in the brewing conflict. Avanzalia and UEPI filed documents, ASEP held a hearing, and UEPI argued that the diagram and electrical studies submitted by Avanzalia were outdated. UEPI also informed ASEP that the substation was already using 270 of its 280-megawatt capacity, which meant that the substation would need new infrastructure and equipment to accommodate Avanzalia's 120-megawatt plant.

After nearly a year and a half of administrative arbitration, ASEP issued an order in June 2017. The order required Avanzalia to submit to UEPI a renewed request for substation access, an updated diagram, and updated electrical studies. The order also required UEPI to grant Avanzalia an access agreement once Avanzalia met these requirements.

One month later, in July 2017, ASEP issued another order setting deadlines for the parties to comply with its directives. In this second order, ASEP concluded that regulations had indeed been violated because Avanzalia had not sent UEPI the required electrical studies and had not obtained an access

agreement with UEPI before seeking a certificate from ETESA.

After further objections from the parties, ASEP issued a final order in October 2017. Two months later, in December 2017, Avanzalia and UEPI finally executed an access agreement. By that time, Avanzalia's viability certificate and definitive license had lapsed and had to be renewed. Still, at long last, Avanzalia was back on the path to selling electricity.

Meanwhile, Avanzalia, expecting to have its solar plant running by January 2017, had entered into long-term power purchasing agreements with five private clients. The first two of these purchase agreements were executed before Avanzalia officially secured an access agreement from UEPI, and the last three were executed after, with the final one executed in July 2018.

### 2. Continued Conflict

Despite the progress described above, difficulties still awaited Avanzalia. As alleged in Avanzalia's complaint, UEPI engaged in additional delay tactics that prevented Avanzalia from connecting to the substation even after the parties executed an access agreement. Those tactics included slow-walking the issuance of necessary construction contracts and stalling construction by withholding necessary information and refusing to approve Avanzalia's designs in a timely manner.

Avanzalia was not able to connect its power plant to the El Coco substation until May 2020, shortly after UEPI sold the substation to an American energy company. Seven months later, in January 2021, Avanzalia finally began selling electricity from its plant through the substation.

### 3. *District Court Proceedings*

Avanzalia filed a two-count complaint in federal court to recover damages stemming from Goldwind's delays. The complaint alleged that Goldwind tortiously interfered with Avanzalia's commercial activity by preventing Avanzalia from doing the following: selling its power project to Fisterra Energy in January 2016, fulfilling its obligations under five purchasing agreements, and selling power to other private clients and customers who would have purchased electricity from Avanzalia on the open spot market, where all remaining power is sold.

Goldwind moved for summary judgment. It made two arguments about its conduct after the parties entered the access agreement. First, Goldwind insisted Avanzalia was required to exhaust its administrative remedies with ASEP before proceeding to federal court. Second, Goldwind challenged the sufficiency of Avanzalia's evidence on all but one of the elements of Avanzalia's tortious interference claims. As for its conduct that predated the access agreement, Goldwind argued that the doctrine of issue preclusion barred Avanzalia's claims because ASEP had determined that Goldwind's delays were justified.

The district court concluded that no reasonable jury could find in favor of Avanzalia on either of its claims. Specifically, the court decided Avanzalia could not satisfy the Illinois state law requirement that a plaintiff claiming intentional interference with an expectancy or contract show that the defendant's actions were directed at a third party. And the court determined that the findings in ASEP's July 2017 order were binding on the court and had preclusive effect with respect to Avanzalia's pre-access agreement claims. So, although the

court found that Goldwind had waived its first argument (that Avanzalia had not exhausted administrative remedies with the ASEP before proceeding to federal court), Goldwind prevailed on its second and third arguments. The court granted summary judgment to Goldwind.

## II

On appeal, Avanzalia raises three issues, some of which contain sub-issues. First, was the district court correct to afford comity to a Panamanian administrative agency's decision? This includes questions about (a) the appropriate standard of review, (b) whether Avanzalia presented sufficient evidence of fraud to preclude recognition of ASEP's order, and (c) whether fraud necessarily precludes such recognition. Second, did the district court properly apply collateral estoppel to bar claims related to ASEP's decision? Third, did the district court err in granting summary judgment on Avanzalia's tortious interference claims? This raises questions about (a) whether the district court considered an impossibility theory of interference under Restatement (Second) of Torts § 766A, and (b) whether the district court properly concluded that Avanzalia failed to show interference under Restatement § 766. We address each issue in turn.

### A. Comity

"Comity is a doctrine of deference based on respect for the judicial decisions of foreign sovereigns [and U.S. states, which are quasi-sovereigns]. When the foreign judiciary is respected … and the rule on which the finding sought to be given preclusive effect is based doesn't offend a strong U.S. policy, the federal courts should defer to that finding." *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011) (collecting cases).

Like the district court, we conclude that public policy is not offended by ASEP's order and deference to that order was due.

### 1. *Standard of Review*

The parties do not agree on the standard of review. Avanzalia argues that the standard for reviewing a district court's decision to apply comity to a foreign ruling is de novo. Goldwind argues that the standard is abuse of discretion.

"Traditionally, decisions on 'questions of law' are 'reviewable de novo,' decisions on 'questions of fact' are 'reviewable for clear error,' and decisions on 'matters of discretion' are 'reviewable for 'abuse of discretion.'" *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 599, 563 (2014) (quoting *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)). Both parties agree that "comity is a matter of discretion." So we review a district court's decision to afford comity to a foreign ruling for abuse of discretion. *Ingersoll Mill. Mach. Co. v. Granger*, 833 F.2d 680, 688 (7th Cir. 1987). But that does not mean that the district court's legal determinations on this question are free from review. *Koon v. United States*, 518 U.S. 81, 100 (1996) ("The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."). After all, "an error of law is necessarily an abuse of discretion." *Tsareff v. ManWebServices, Inc.*, 794 F.3d 841, 848 (7th Cir. 2015).

### 2. *We Need Not Reach Whether Fraud Precludes Recognition of a Foreign Judgment*

As noted above, Avanzalia contends that comity must not be applied to foreign judgments procured by fraud. In *Hilton v. Guyot*, the Supreme Court first addressed the recognition of

foreign judgments as a matter of "general" federal common law, concluding that the merits of a valid judgment rendered in a foreign court cannot be re-litigated if there is nothing to show, among other things, fraud in procuring the judgment. 159 U.S. 113, 163 (1895).

*Hilton* was decided long ago, but we still have not resolved the question of whether federal courts *must* refuse to afford comity to any prior foreign judgment procured by fraud, or whether courts simply have the *discretion* to do so. Some of our sister circuits have refused to afford comity to any prior foreign judgment procured by fraud. *See, e.g.*, *Derr v. Swarek*, 766 F.3d 430, 438 (5th Cir. 2014) (quoting *Hilton*'s discussion of "fraud in procuring the judgment" and describing it as an "exception[] to recognition of a valid foreign judgment"). Other circuits appear to allow district courts, in their discretion, to decline to recognize foreign judgments obtained by fraud. *See, e.g.*, *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997) ("[A] federal court may, in its discretion, decline to recognize and enforce a tribal judgment on equitable grounds, including the following circumstances: (1) the judgment was obtained by fraud …."); *see also Turner Ent. Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (describing "whether the judgment was rendered via fraud" as one of several "[g]eneral comity concerns").

Ultimately, we need not resolve this issue because each of Avanzalia's theories of fraud fail for the reasons discussed below.

### 3. *Avanzalia Did Not Present Sufficient Evidence of Fraud to Prevent Comity*

Avanzalia's only argument against affording comity to ASEP's order is that the order was procured by Goldwind's fraudulent representations. To that end, Avanzalia sketches four theories of fraudulent representations and omissions: first, UEPI misrepresented that new solar and wind projects were going to begin or had already begun construction, leaving no room for Avanzalia's project; second, UEPI misrepresented that the new projects already had access agreements; third, UEPI failed to inform ASEP that UEPI was already in possession of Avanzalia's original electrical studies; and fourth, UEPI failed to inform ASEP about the existence of its 2014 agreement with UEPI and UEPII to limit access to the El Coco substation. But for one reason or another—whether waiver, irrelevance, or because the district court did not abuse its discretion in rejecting the theory—none of these four theories changes Avanzalia's fortunes with respect to the comity question.

The first and second alleged misrepresentations are related. Avanzalia asserts that UEPI fraudulently misrepresented that new power projects were going to begin construction in 2017 and had already secured access agreements to the El Coco substation, which meant that the substation could not accommodate Avanzalia's connection. But Avanzalia's contentions before the district court were limited to one paragraph, in stark contrast to the several pages Avanzalia has devoted to them on appeal. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (observing rule that "raising an issue in general terms is not sufficient to preserve specific arguments that were not previously presented"). And Avanzalia

merely cited the statements it believed were misrepresentations without any meaningful argument to the district court about why the statements were misrepresentations or material.

Moreover, the district court rightly rejected the limited argument that Avanzalia presented for two reasons. One, Avanzalia, not UEPI, was the party to provide ASEP with the information Avanzalia says was fraudulent. In other words, Avanzalia did not show a statement by UEPI, much less a fraudulent one. And two, the alleged false statements were either true or not dispositive to ASEP's decision. There were indeed new plants that were licensed to connect to the El Coco substation. And those new plants were only one of three reasons, including changes to the "topology of the network," that ASEP cited for its decision to order updated electrical studies. Also, the evidence Avanzalia provided to show that UEPI misled ASEP regarding the anticipated construction of new plants—that construction had not begun at the time of the statement (March 2017) and had not concluded by 2021—is insufficient to show that UEPI fraudulently misrepresented its belief that the construction projects would begin in 2017. Avanzalia complains that the district court misconstrued the little information Avanzalia provided, but the district court did not abuse its discretion in rejecting Avanzalia's underdeveloped argument about these two theories of fraud.

Avanzalia's third theory of how UEPI fraudulently procured a favorable ASEP ruling fares no better. Avanzalia asserts that UEPI neglected to tell ASEP that it already possessed Avanzalia's prior electrical studies. This theory falls short for two reasons: waiver and irrelevance. First, we cannot consider this theory because Avanzalia has merely asserted

that UEPI failed to tell ASEP this information. Avanzalia has provided no argument that UEPI did so fraudulently. *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived."). Moreover, even if we accept that UEPI already had the electrical studies by the time of the June 2017 order and fraudulently concealed that information, that would not carry the day for Avanzalia because UEPI's failure to reveal this information is irrelevant to whether the July 2017 ASEP order was procured by fraud. Recall, ASEP issued an order in June 2017 requiring Avanzalia to, among other things, provide UEPI with updated electrical studies. Then, a month later, ASEP issued another order setting deadlines and concluding that Avanzalia had violated regulations by not originally sending UEPI the electrical studies and by seeking a certificate from ETESA before first obtaining an access agreement from UEPI. The June order would have likely still been issued even if ASEP knew that UEPI had the old electrical studies because updated electrical studies were needed given that circumstances had changed between the time Avanzalia first sought access and the time that ASEP issued the order. And the July order would have still been issued because—even setting aside the electrical studies issue—Avanzalia violated the regulations by seeking an ETESA certificate without first securing an access agreement from UEPI. Therefore, we cannot say that UEPI's failure to tell ASEP that it already possessed Avanzalia's prior electrical studies fraudulently procured the July 2017 order to which the district court afforded comity.

We come to Avanzalia's fourth and final theory of how UEPI fraudulently procured a favorable ASEP ruling: Avanzalia contends UEPI failed to tell ASEP about an

agreement between the three UEP companies to limit other
market agents' access to the El Coco substation**.** The theory
fails because it is irrelevant to the question of whether the or-
der was procured via fraud. Even assuming that the agree-
ment between the three UEP companies was unlawful and
contradicted UEPI's reason for denying access to the substa-
tion, Avanzalia does not explain how that agreement barred
UEPI from executing an access agreement with Avanzalia
once Avanzalia satisfied all technical requirements. Indeed, at
that point, the regulations would *require* UEPI to enter into an
access agreement, meaning UEPI would have to simply eat
the cost of any contract damages arising out of the agreement
between the UEP companies. Further, to the extent Avanzalia
argues that Goldwind "procured a foreign judgment via
fraud" by lying about *any* issue during the foreign proceed-
ings, Avanzalia is mistaken. The lie must *procure* the foreign
judgment; the mere existence of an immaterial lie is not
enough.

## B.  Collateral Estoppel

We turn to whether the district court properly applied col-
lateral estoppel—also known as issue preclusion—to resolve
Avanzalia's claim that Goldwind is liable for its alleged pre-
access agreement interference. We consider the question de
novo. *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000). And
like the district court, we take the parties' lead in applying Il-
linois law to the question.

Under Illinois law, the doctrine of issue preclusion applies
when three elements are met:

> (i) the issue decided in the prior adjudication is
> identical to the issue in the current action;

(ii) the party against which preclusion is asserted was a party or in privity with a party to the prior case; and

(iii) there was a final judgment on the merits in the prior action.

*See Nowak v. St. Rita High School*, 757 N.E.2d 471, 478 (Ill. 2001). Two additional requirements are key. One, the party against whom issue preclusion is asserted must have litigated the issue in the first proceeding. Two, the issue must have been necessary to the decision in the first proceeding. *Am. Fam. Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000).

Here, the parties dispute only the first element: whether the issue decided in the prior case is identical to the issue in this action. Avanzalia contends the issues are not the same and accuses Goldwind of misstating the scope of the ASEP proceeding in arguing otherwise. Goldwind says the issues are the same—namely, Avanzalia's ground for relief before both the ASEP and the district court was that UEPI unlawfully delayed substation access.

Goldwind is correct. To prevail on either of its tortious interference claims, Avanzalia must show that Goldwind— through UEPI—engaged in an "unjustified" delay. *See Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994) (articulating elements for Illinois tortious interference with contract claim); *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007) (articulating elements for Illinois tortious interference with an expectancy or contract). ASEP ruled that Avanzalia must cure its regulatory breaches before obtaining an access agreement with Goldwind. Given ASEP's ruling that Goldwind's delay was "within [UEPI's] right" in the

context of the Panamanian regulatory proceeding, Avanzalia cannot show the delay was "unjustified" in the context of an American tort.

Avanzalia offers a second reason it believes the issues in the ASEP proceeding and in this court are not identical: Avanzalia is pursuing a tort claim for damages in federal court but was not pursuing the same in the ASEP proceedings. This argument is unavailing because unlike claim preclusion, issue preclusion does not require causes of action to be identical. As the name suggests, the question is whether *issues* have been resolved, not whether specific claims were adjudicated. *See Mancuso v. Lahman*, 2018 IL App (1st) 170185-U, ¶ 37 ("[W]hile [plaintiff] may not have had the chance to litigate certain *claims*—the tortious-interference counts—he most certainly had the opportunity to litigate the *issue* of undue influence.… It just so happens that, in this case, that precluded issue was the death knell of the tortious-interference counts ….") (unreported); *see also Creation Supply, Inc. v. Selective Ins. Co. of Se.*, 51 F.4th 759, 765 (7th Cir. 2022) (discussing difference between issue preclusion and claim preclusion under Illinois law and observing that "an 'issue' for issue-preclusion purposes is broader than a 'claim'; an issue can be any question of fact or law so long as it was material and controlling to the underlying judgment").

Avanzalia's last attempt to convince us that the issues it seeks to litigate are not identical to the those adjudicated by ASEP relies on the "new evidence" exception to issue preclusion. Specifically, Avanzalia points to the UEP companies' 2014 agreement, which Avanzalia discovered while litigating this case. This argument fails for three reasons. One, for the "new evidence" exception to apply "the litigant against

whom collateral estoppel is asserted must show that the additional evidence was crucial to a proper resolution in the first action and that he bore no responsibility for the absence of the testimony or evidence in the prior adjudication." *Fred Olson Motor Serv. v. Container Corp. of Am.*, 401 N.E.2d 1098, 1102 (Ill. App. Ct. 1980). As explained above, Avanzalia has failed to show that the UEP companies' 2014 agreement to limit substation access was relevant—let alone essential—to the ASEP order. Two, Avanzalia claims ASEP's procedures rendered the proceeding fundamentally unfair because Avanzalia did not discover the agreement in those proceedings. The district court correctly put this argument to rest, explaining there is no basis for considering the ASAP proceedings procedurally unfair where "[t]he parties had ample opportunity over approximately twenty-one months to complete service of process, develop their respective cases, submit documentary evidence, file motions, and even appeal ASEP's resolutions." *Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, 2023WL319135 at *5 (N.D. Ill. Jan. 19, 2023). Three, Avanzalia suggests that because the ASEP proceedings were regulatory in nature and not an "arbitration," collateral estoppel was improper. But that suggestion is misplaced because Illinois courts apply collateral estoppel to administrative decisions. *KT Winneburg, LLC v. Roth*, 168 N.E.3d 685, 693 (Ill. App. Ct. 2020).

In sum, the district court did not err in applying collateral estoppel to issues that ASEP decided and Avanzalia sought to relitigate in federal court.

## C. The District Court Prematurely Granted Summary Judgment

The final issue on appeal is the district court's grant of summary judgment in favor of Goldwind, which we review

de novo. *White v. Woods*, 48 F.4th 853, 861 (7th Cir. 2022). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether there is any such dispute, we begin by surveying Illinois law on tortious interference with contract. We conclude that the district court considered only one of two theories by which a plaintiff may prove tortious interference under Illinois law. Although the district court correctly reasoned that Avanzalia could not prove tortious interference under the one theory the court considered, we remand for the court to assess whether summary judgment is also appropriate under the other theory.

    1.   *Illinois Law Recognizes Two Distinct Tortious Interference Theories Here*

Illinois recognizes two distinct theories under which a plaintiff may prove tortious interference—both reflected in the Restatement (Second) of Torts. Under Restatement § 766, a plaintiff can prove the defendant induced a third party not to perform the contract. Or, under § 766A, a plaintiff can prove the defendant wrongfully prevented the plaintiff "from performing the contract and, as a result, [the plaintiff] is unable to require the third party to perform." *Scholwin v. Johnson*, 498 N.E.2d 249, 255 (Ill. App. Ct. 1986) (adopting the impossibility theory of tortious interference in § 766A); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1344–45 (7th Cir. 1992) (recognizing and adopting *Scholwin* and § 766A).

There is no dispute that the district court considered only § 766 in construing Avanzalia's claim. The court did not apply § 766A or otherwise engage with the cases like *Scholwin* and *Havoco* recognizing this second theory in Illinois. Instead, in

ruling that tortious interference always requires the defendant to have directed conduct toward a third party, the district court cited only cases requiring a showing of conduct directed toward a third party under § 766. *Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, 2023WL319135 at *10 (N.D. Ill. Jan. 19, 2023) (citing *George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330–32 (7th Cir. 1983), and *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 686 (7th Cir. 2014)). It was error for the district court to not consider the theory of tortious interference recognized in § 766A.

Goldwind attempts without success to distinguish the cases applying § 766A in Illinois. Goldwind asserts that the *Havoco* and *Scholwin* decisions involved conduct directed toward a third party and that they did not endorse the impossibility theory. But that is doubly wrong. The courts in those cases never found that the conduct at issue in those cases was directed toward third parties. And those decisions did endorse the impossibility theory.

In *Scholwin*, an Illinois appellate court held that, although tortious interference might "seem[] to require inducement of the third party to breach the contract, … the cause of action is broader and encompasses the situation in which the defendant prevents the plaintiff from performing the contract and, as a result, he is unable to require the third party to perform." 498 N.E.2d at 255. The *Scholwin* court determined the plaintiff's failure to plead conduct directed toward a third party was "not fatal" because the plaintiff instead pled "facts showing that the [defendant] intentionally prevented [plaintiff] from performing the contract." *Id*. at 256.

In *Havoco*, relying on *Scholwin*, our court stated that a defendant is liable for tortious interference when the defendant

prevents the plaintiff's performance. 971 F.2d at 1344. We affirmed the impossibility theory, concluding the defendant's "fraudulent conduct made it impossible for [the plaintiff] to reach an agreement with [the third party] and thus retain the contract." *Id*. at 1344–45. We even expressly stated that "a tortious interference claim in Illinois 'encompasses the situation in which the defendant prevents the plaintiff from performing the contract.'" *Id*. (quoting *Scholwin*, 498 N.E.2d at 255).

On remand, the district court should consider § 766A in its analysis of Avanzalia's allegations that Goldwind made two sets of performances impossible: (1) Avanzalia's obligations under its June 2019 access contract with ETESA, if its certificate from ETESA is best understood as a contract rather than a license; and (2) Avanzalia's obligations pursuant to its post-access agreement private client purchase agreements. Section 766A does not apply to the following two items: Avanzalia's definitive license from ASEP (which Avanzalia has not shown to be a contract) and Avanzalia's expected sales on the open spot market (which were expectancies rather than contracts).

Section 766B, much like § 766A does for contracts, allows a plaintiff to succeed on a tortious interference claim without showing that the defendant directed conduct toward a third party when a defendant's conduct prevents the others from accruing or continuing an expectancy. Avanzalia argues that the district court also erred in failing to apply this section, but Avanzalia does not point us to any Illinois decision adopting § 766B and proffers only a skeletal argument about why Illinois courts would recognize the theory. Without more, we will not reach that question.

2. *The District Court Did Not Err in Rejecting the Third-Party Interference Theory*

Finally, Avanzalia argues that it demonstrated an issue of material fact about Goldwind's conduct directed toward third parties under § 766. Here, Avanzalia identifies those third parties as ETESA, ASEP, Avanzalia's private purchase clients, and prospective open spot market customers. On appeal, Avanzalia argues that Goldwind's conduct satisfies each of § 766's requirements. We can limit our review, however, to the "directed toward" requirement, which is where Avanzalia's argument loses. *See F.C. Bloxom Co. v. Tom Lange Co. Int'l, Inc.*, 109 F.4th 925, 934 (7th Cir. 2024) ("When a district court enters summary judgment on multiple independent grounds, reversal is appropriate only if *none* of those grounds is supported by the record.").

Ultimately, for the same reasons as the district court, we see no basis upon which to distinguish Avanzalia's argument from similar arguments we have rejected. In *George A. Fuller*, the plaintiff argued that the defendants tortiously interfered with subcontracts by not paying the plaintiff money owed for work performed. 719 F.2d at 1332. We concluded that such acts could not serve as the predicate of tortious interference with the plaintiff's subcontracts, since those alleged acts were directed towards the plaintiff and not the third-party subcontractors. *Id.* We concluded the same in *McCoy*, explaining that the plaintiff's claim failed under Illinois law because it did not allege that the defendant interfered improperly by communicating with the third party. 760 F.3d at 686. As in those cases, Avanzalia has failed to demonstrate an issue of material fact about whether Goldwind's conduct satisfies § 766's third party "directed towards" requirement because Avanzalia

cannot show that Goldwind's interfering actions or communications were "directed in the first instance at the third part[ies]." *Schuler v. Abbott Lab'ys*, 639 N.E.2d 144, 148 (Ill. App. Ct. 1993).

## III

In an otherwise comprehensive opinion, the district court did not consider whether Goldwind wrongfully prevented Avanzalia from performing its contractual obligations in violation of § 766A. Accordingly, we VACATE the district court's grant of summary judgment and REMAND for further proceedings on that question alone. In all other respects, the judgment is AFFIRMED.